### In the Matter of JOHN PALMIERI, an Attorney.

First Department, December 29, 1916.

Attorney at law disbarred — unprofessional conduct in defense of one accused of crime — allowing witness to give testimony known to be false and assuming truth of same on summing up — duty of attorney in criminal cases — dishonorable methods must not be employed — Fifth Canon of Ethics.

Attorney at law disbarred for gross professional misconduct in that, being attorney for a person indicted for receiving from a woman the proceeds of her prostitution contrary to section 2460 of the Penal Law, he aided and abetted the complaining witness, who had been in hiding, to give

to the court and jury the false impression that she had just come to town to testify for the defendant, contrary to her testimony given before the grand jury, when as a matter of fact the attorney had interviewed her the night before, and for allowing her to give other testimony known by him to be false, and for treating the same as true when summing up.

The obligation of an attorney at law to the court of which he is an officer is no less stringent in criminal than in civil cases, and the Judiciary Law authorizing the court to discipline its attorneys does not differentiate between their actions in criminal and civil proceedings, and in both instances an attorney must employ honest methods and refrain from deceit and chicane.

Although an attorney under the Fifth Canon of Ethics may assume the defense of a person accused of crime, regardless of his personal opinions as to his guilt, he is only entitled to prosecute the defense "by all fair and honorable means."

PAGE, J., dissented, with opinion.

DISCIPLINARY proceedings instituted by the Bar Association of the City of New York.

*Einar Chrystie* [*Thomas D. Thatcher* of counsel], for the petitioner.

*Howard Taylor*, for the respondent.

CLARKE, P. J.:

The respondent was admitted to the bar in February, 1901. The charges grow out of his conduct of the defense in the case of *People* v. *De Lane*, tried in the County Court of Bronx county in March, 1915. One John De Lane was indicted by the grand jury of Bronx county under section 2460 of the Penal Law for having received from one Jeanette Annette the proceeds of her prostitution. This woman had verified a complaint before the committing magistrate and had appeared before the grand jury and testified, and upon her testimony an indictment was found on October 14, 1914. Shortly thereafter, and while under detention as a witness, she made her escape and could not thereafter be discovered, although diligently sought for. Subsequently, on February 1, 1915, two other indictments were found against De Lane charging similar offenses, upon the testimony of two other women who claimed to have been present upon occasions when the Annette

woman paid the proceeds of her prostitution to De Lane. Upon one of these latter indictments De Lane was put upon trial. Some time before the trial the attorney who had theretofore represented him called upon the respondent and stated that De Lane desired counsel in the case. Two interviews thereupon had between the respondent and De Lane resulted in respondent's retainer and his consent to defend him. In the course of those interviews respondent was informed that the Annette woman was the woman who had made the charges; that for some time she had been kept by the district attorney in several flats, instead of being put in the city prison or house of detention, and that thereafter she had gone to Amsterdam, N. Y., in order to keep away from the district attorney. The respondent admitted that when he asked De Lane how he knew this, the latter said: "I call her up once in a while and speak to her and she tells me all about it; in fact, I send her money." In this interview De Lane handed the respondent a copy of the indictment upon which he was to be tried, and the respondent found that her name was not upon the indictment. Up to this time respondent did not know of any prior indictment on the testimony of the Annette woman, and the respondent advised De Lane that he had nothing to fear if the Annette woman denied that she gave him any money, and he insisted that she be brought to New York. De Lane thereupon got into communication with the woman by long-distance telephone, and on the morning of March 9, 1915, which was the day upon which the trial was to be commenced, she came to the respondent's house with a suitcase in her hand and told respondent that she had just arrived from Mayfield, which is a place north of Amsterdam. Upon being questioned by respondent, she confirmed De Lane's statement to the effect that she had been kept by the district attorney in two apartments. She denied having given money to De Lane, but admitted that she had made a contrary statement to the district attorney. When asked by the respondent whether she had signed any statement to that effect, she said, "No," and also stated that she had not appeared before the grand jury or in any other judicial proceedings. The district attorney in his opening to the jury stated: "Jeanette Annette will not be a

witness here.  Her two comrades or associates will be witnesses.  She will not be a witness, because of the fact that after I had placed her in an apartment here in the Bronx, some one came to that apartment and asked her to go down town, a Mrs. Mancini, or a woman who calls herself Mrs. Mancini, the alleged wife of a man named Tony Rich, and a pal of a fellow named Pandolphi.  She came up to the Bronx, had a whispered conversation with this girl, the girl went out with her, and the girl has never been seen since.  That is how I will account for the absence of Jeanette Annette, the girl who first made the complaint in this case against De Lane, the girl with whom he lived; the girl who kept him for years here in his apartment in the Bronx."

By this statement the respondent was fully informed that the Annette woman was the complaining witness, and that the district attorney regarded her as a material witness for the prosecution if her testimony could be obtained, and also that while she had been in the custody of the district attorney she had been enticed away and that the district attorney would account for her absence by proof of this fact.  The respondent objected to this statement of the district attorney. He testified in this proceeding that he regarded it as very prejudicial to have the defendant's name connected with the disappearance of this woman.

The trial proceeded, and after producing several witnesses who gave direct testimony as to the offense charged, the district attorney called two detectives who testified concerning the disappearance of the Annette woman, their search for her under the direction of the district attorney and their unsuccessful efforts to find her.  These witnesses were not cross-examined by respondent because, as he testified, there was absolutely no question that the woman had disappeared.

The People then rested.  The respondent made the usual motions and then asked for an adjournment until the following morning on the ground that he had not decided whether to sum up or to open in the morning.  After a lengthy discussion upon this point between the court, the respondent, and the district attorney, and a short opening by the respondent, an adjournment was had until the following morning.

From the opening of respondent and his colloquy with the court, it is clear that he had not then decided to call the Annette woman. He testified that he knew that if she testified truthfully, she would have to testify as to the way in which she got to Amsterdam, that she had come back because De Lane had asked her to and that De Lane had been sending her money while she was in hiding because she needed it for her support, and that while hidden from the district attorney she was accessible to the counsel for the defendant. It is clear that if the witness were produced after the occurrences on the first day of the trial and testified truthfully as to her connection with the defendant and his counsel, the jury could have reached no other conclusion than that the defendant had to do with her disappearance. This must be borne in mind in considering what followed. Before coming to court on the second day of the trial, and at seven-thirty that morning, the respondent had another interview with the Annette woman, who was again brought to respondent's home on Ocean Parkway, Coney Island, pursuant to his request. She did not, however, appear in the court room during the morning, which was taken up with the examination of character witnesses. The respondent called her to the stand in the afternoon. When she entered the court room she was carrying a suitcase. Respondent examined her as follows: "Q. Where do you live? A. Now I have no residence at all, I don't live anywhere just at present. Q. What did you have in your hand when you came in here?" An objection to this question was sustained.

When questioned before the grievance committee as to his reasons for asking that question, respondent testified: "Q. Why did you think she brought that bag into court? A. My impression was to lend belief that she had just arrived from Mayfield, but as a matter of fact, she had arrived, I believe, the day before."

Respondent's examination of the Annette woman proceeded: "Q. Where did you come from, Miss Annette? A. Why, I just came from Mayfield, N. Y. Q. Where is Mayfield, N. Y.? A. It is up the State; just how far I couldn't tell you. Q. Is it near any great city? A. I don't know that; I couldn't tell you. Q. How did you get from Mayfield to New York? A. Why, I

came down on the New York Central and Hudson River; I came down on the train last night; I came down here because I read in the paper that Mr. De Lane's case — "

So that at the very outset of her testimony this witness testified falsely to respondent's knowledge in answer to his questions. She further testified on her direct examination that she did not have to come; that nobody knew where she was to bring her here, but that she came anyway to give testimony in favor of De Lane. The essential parts of this testimony were false, to respondent's knowledge.

Upon cross-examination the reasons of the witness for coming to court were further inquired into. In answer to questions put by the court, she produced a clipping of an evening paper of the day before and testified that that was the clipping she had read in Mayfield which induced her to come to New York.

Having testified that she had taken the nine minutes past eleven train the night before from Amsterdam and arrived in New York that very morning at five minutes past five, and that no one knew she was coming to court, it became necessary for her to account for her actions from the time of her alleged arrival until her appearance in court. In her efforts to do this she was led from one lie to another, and although the falsity of her testimony is apparent, she successfully concealed from the court and the jury the fact that she had come to New York at the request of the defendant and had been in consultation with the defendant and his counsel for two days. Respondent did nothing to correct this testimony; on the contrary, his repeated attempts to emphasize the fact that the witness had appeared with a suitcase in her hand, even going so far as to have the suitcase offered and marked in evidence, were evidently made to support her testimony that she had come that day from up the State. The result finally was that when the case went to the jury, although it had been proven by witnesses, and even by the production of the testimony of the Annette woman before the grand jury, that she had on several occasions paid the proceeds of her prostitution to De Lane, her false testimony with regard to her reasons for coming to court had succeeded in so far as to conceal the actual facts.

In so far as her false swearing was successful, the respondent took advantage of it in his summing up. That she had lied had become evident, and the respondent admitted it to some extent. That she had come to court pursuant to his instructions and the instructions of his client nobody knew, and the respondent took advantage of it by adopting her statements on this point and claiming credit for them, although he knew they were false. It is only necessary upon this point to recite the following statement of the respondent in his summing up to the jury: "We have got her here, and, thank God, gentlemen of the jury, that Divine Providence has brought that woman here. If it was the Evening *Journal*, I thank the Evening *Journal*. If it was anybody else — she said it was the Evening *Journal* that she read it in, and by the way, she produced a clipping to the Judge, if I am not mistaken; isn't that right, Judge? The Court: Yes. Mr. Palmieri: Thank God, I say to the press."

The learned official referee concludes that respondent's conduct in not disclosing the false swearing of the Annette woman and insisting that credit should be given to statements made by her which he knew to be false, as above detailed, cannot be overlooked because they constitute gross professional misconduct. The able counsel for the respondent has attempted to justify this conduct upon the ground of the duty which an attorney owes to his client in a criminal case. We do not admit that counsel's obligation to the court of which he is an officer is any less stringent in a criminal than in a civil case. Subdivision 2 of section 88 of the Judiciary Law (Consol. Laws, chap. 30; Laws of 1909, chap. 35), as amended by chapter 253 of the Laws of 1912 and chapter 720 of the Laws of 1913, authorizes this court " to censure, suspend from practice or remove from office any attorney * * * who is guilty of professional misconduct * * * deceit * * * or any conduct prejudicial to the administration of justice." The statute does not differentiate between criminal and civil proceedings. Attorneys are not admitted *eo nomine* to practice in the criminal *or* civil courts. They are admitted to all the courts of the State. They cannot divest themselves of any of their professional obligations by passing from one forum to another.

We have expressed our views as to the duties and responsibilities of an attorney where false testimony has been offered to his knowledge in *Matter of Hardenbrook* (135 App. Div. 634; affd., 199 N. Y. 539); in *Matter of Schapiro* (144 App. Div. 1), and *Matter of Mendelsohn* (150 id. 445), and where statements have been made by him to deceive the court in *Matter of Goodman* (158 App. Div. 465). We cannot think that an attorney conforms to professional standards where he permits a witness procured by him, and regarded by him as highly important, to stage a play by suddenly appearing in the court room with a suitcase in her hand, and by permitting her to testify that she had just arrived on an early morning train, that no one knew of her coming, and that her attention had been called to the trial by an evening paper read in an up-state town the night before, when he knew that she had been sent for by his client, had been at his home in consultation with him in a distant part of the city each day of the trial, and, to his knowledge, was deliberately and knowingly testifying falsely. His failure to say to her on her first statement that she had just reached town that morning, "Why, are you not mistaken? Did you not come to see me yesterday?" is susceptible to the inference that he knew exactly what she was going to testify to, and his second question as to what she had in her hand when she entered the court room was to draw attention to the suitcase and add verisimilitude to her narrative. If there be any grounds for not holding respondent to a strict accountability for her false testimony, there certainly is no excuse for his adopting such false testimony in his own summing up, for which he was alone responsible. For the expression of his thankfulness to God for the intervention of Divine Providence in producing this witness, when he himself was the instigating cause by the direct instrumentality of his client, he must be held personally responsible, as attempting thereby to deceive the court and jury by thus solemnly ratifying her false testimony.

We approve of the conclusion of the learned official referee, that respondent has been guilty of gross professional misconduct. We think such conduct constituted deceit, was prejudicial to the administration of justice, and that respondent is

First Department, December, 1916.          [Vol. 176.

unfit to continue the practice of the law. He is, therefore, disbarred.

SCOTT, SMITH and DAVIS, JJ., concurred; PAGE, J., dissented.

SCOTT, J. (concurring):

Ordinarily in a case like the present I should content myself in concurring in the very satisfactory and convincing opinion of the presiding justice. But the dissenting opinion of my brother PAGE raises a question which overshadows in importance the concrete question whether or not this respondent has been guilty of such professional misconduct as deserves severe disciplinary action on the part of the court. While I do not understand, or for a moment believe, that Mr. Justice PAGE intends to advocate a different standard of professional honor for lawyers engaged in defending criminal prosecutions from that which should obtain in civil causes, yet there is much in the opinion which may be, and if agreed to doubtless would be, cited by dishonest lawyers to justify fraud and chicanery in defending criminals such as would not be tolerated in the prosecution or defense of any civil action, just as the often-quoted dictum of Lord BROUGHAM as to the duty which a lawyer owes to his client, and which is cited to us by this respondent's counsel, has been frequently misconstrued and misapplied as if it were an authority for wrongdoing, which it distinctly is not.

There is no recognized rule of law or ethics which justifies the conduct of counsel in any case, civil or criminal, in endeavoring by dishonest means to mislead the court or jury, even if to do so might work to the advantage of his client. The interest of the public and the honor of the profession alike require that counsel in a criminal case, as well as a civil, shall employ honest methods and refrain from deceit and chicane. In this sense I deny most emphatically that the obligations of an attorney to the court are any different in a civil and in a criminal case. This obligation is clearly recognized and defined in the Fifth Canon of Ethics, which is quoted by my brother PAGE. After asserting the right of a lawyer to assume the defense of a person accused of crime, regardless of his personal opinion as to his guilt, the canon proceeds: "Having undertaken such defense, the lawyer is bound *by all fair and honorable means,*

App. Div.]     First Department, December, 1916.

to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law." It will be difficult to find in this canon a justification for using, in behalf of an accused person, unfair and dishonorable means, such as I am convinced were used by the respondent.

The misconduct charged against the respondent occurred in the course of a trial in which he was defending a man named De Lane indicted for receiving from a prostitute, named Jeanette Annette, the proceeds of her prostitution. This woman would obviously be a most important witness for the defense provided she would swear she never gave the accused any money, and provided also that the jury believed her testimony. It was apparently a matter of little or no difficulty to get her to swear to the innocence of the accused. The real difficulty lay in inducing the jury to believe her. As matter of fact she had been kept for some time, by the accused or his friends, beyond the reach of the district attorney in a little known town in a distant part of the State. By the respondent's instructions she was sent for to come to the city of New York where the trial was to be had, and spent parts of two days before she was called as a witness at the respondent's private residence in consultation with him. After that she was called as a witness and testified in behalf of his client. It is quite evident that if these facts as to the power of the accused over the witness, and her consultation with his counsel, had been made known to the jury, little credence would be given to her testimony. To add verisimilitude to the woman's evidence in behalf of the accused, some one devised the scheme of having her come into court with a dress suit case and to swear that she had just arrived in the city, having traveled all night from the place at which she had been stopping, and that she had come, not at the behest of the accused, but because she had seen in a New York newspaper an account of the trial, and, knowing the accused to be innocent, had of her own accord hastened to New York and to the court room to testify in his behalf.

I say that some one concocted this scheme because it is beyond belief that the woman thought it out for herself unaided and uncoached. She was a common prostitute and,

First Department, December, 1916.          [Vol. 176.

as her examination indicated, had no more education or intelligence than is commonly found among such persons. It is inconceivable that she should have either appreciated the necessity of accounting for her presence in the way she undertook to do, or developed the elaborate story to so account for it. That some one invented the story and coached her in it I consider to be certain. I do not say that it was the respondent, although he had ample opportunity to do so in the course of her two visits to his residence, but if the only charge against him was that he instructed the Annette woman to swear falsely, it may be that no more than a Scotch verdict could be reached on the evidence.

However this may be, it is apparent beyond any reasonable doubt that respondent was not taken by surprise at the woman's evidence as to how she came to appear at the trial, but, on the contrary, expected her to testify as she did. His examination of her showed this clearly. His first question to her was: "Where do you live?" The answer should have been "Mayfield, New York," but the woman was either too stupid or too nervous to make the expected answer, and replied, "Now I have no residence at all. I don't live anywhere at present." Respondent's next question was: "What did you have in your hand when you came in here?" The reference was to the dress suitcase which was a part of the stage setting designed to fortify the story the woman had been instructed to tell as to how she came to appear as a witness. The question served to recall to the witness the story she was to tell, and in response to the question, "Where did you come from, Miss Annette?" the witness replied: "Why I just came from Mayfield, N. Y." Thereafter in response to a series of questions put by respondent the witness testified that Mayfield was up the State and that she had come down "on the train last night" because she had read something in the newspaper about De Lane's case. She also testified in response to respondent's questions that she did not have to come — that nobody knew where she was, to bring her down, but that she came anyway to testify in favor of De Lane. All this testimony was elicited by respondent's questions. It was all false, and respondent knew that it was false, and must have

known from the beginning that the woman was reciting a false, concocted story; and yet he persisted in putting questions to her the effect of which was to develop and bring before the jury the whole elaborate lie.

The wholly unnecessary reference to the dress suitcase, and the production of it in court were solely for the purpose of bolstering up the Annette woman's false testimony as to her having just arrived from Mayfield. This was practically admitted by the respondent before the grievance committee of the Bar Association. When questioned as to his reason for asking the woman about the suitcase he replied as follows: " Q. Why do you think she brought that bag into Court ? A. My impression was to lend belief that she had just arrived from Mayfield, but, as a matter of fact, she had arrived, I believe, the day before." Again: " Q. What could be the possible relevancy before the jury of the question what she had in her hand when she came in, what was your idea, how would that help the jury in determining any issue in the case ? A. The fact that she had the bag in her hand, while it did not have any relevancy on the passing of the money, it was relevant on the question where this woman had been all this time. This woman, as was told by Mr. Martin in his opening address, had been absent a great many months."

Later on in the trial, as if to emphasize to the jury the truth of the woman's testimony, which he knew to be false, the respondent offered the suitcase in evidence. Here then we have the spectacle of an experienced trial lawyer leading a witness on by skillful questioning to tell a story which he knew to be false in every particular, and the object of which, as he well knew, was to induce the jury to believe the evidence she was about to give in defense of the prisoner. What matters it, under these circumstances, whether the respondent himself concocted the story and drilled the woman to tell it, or adopted and sought to make effective use of the work of another ? In either case he consciously aided the witness in her attempt to mislead the court and jury by her false testimony.

Not content with this, the respondent, in his summing up to the jury, adopted as his own the woman's false testimony. Referring to her he said: " We have got her here, and thank

God, gentlemen of the jury, that Divine Providence has brought that woman here. It was the Evening *Journal*. If it was anybody else — she said it was the Evening *Journal* that she read it in, and, by the way she produced a clipping to the Judge, if I am not mistaken — isn't that right, Judge?" The Court: "Yes." Mr. Palmieri: "Thank God, I say to the Press."

When the respondent made this address to the jury he knew that he was stating what was not true; he knew that it was the accused prisoner acting upon the respondent's advice, and neither Divine Providence nor the Evening *Journal*, nor any other newspaper, that had induced the witness to appear at the trial; he knew that if she had produced a clipping in court, that clipping had been provided as a part of the stage setting to give apparent verity to her concocted lie. If respondent had taken the stand and testified falsely, as the Annette woman did, no one would question the justice of severe discipline. In my opinion his obvious helping her on to lie on the stand, and his deliberate and emphatic adoption in his summing up to the jury of what he personally knew to be false testimony was the equivalent of false swearing by himself, and was precisely as reprehensible and worthy of discipline as it would have been if he had himself taken the stand and testified falsely. I trust that the day may never come when such conduct on the part of a lawyer will be commended or even excused because he was engaged in a criminal case. It is to be borne in mind that we are not dealing with a young attorney who might charitably be considered as having been led astray by zeal and inexperience. The respondent, we are told, has been a member of the bar for twenty-five years and has been during that time actively engaged in trying cases. He has been a Deputy Attorney-General and the judge of an important court in the city of New York. He certainly cannot be heard to plead that he did not know what he was doing or that it was wrong. Nor was it the case of a lawyer suddenly confronted with an unexpected situation without opportunity to deliberate upon the course which he should adopt. Whoever devised the scheme to give credence to the woman's story, whether respondent or another, the plan was skillfully devised

and deliberately carried out by respondent himself by a series of skillful questions. It may be that when he found that the witness was disposed to lie it was not his duty to denounce her, but at least it was his clear duty not to help her along, and not to use her false testimony in his address to the jury as if he believed it to be true.

Finally it is said that the matter as to which the witness lied was only collateral to the main issue in the case, and that she could not have been convicted for the crime of perjury for swearing falsely. . This may be true, but whether collateral or not, it was deemed to be very important as a means of leading the jury to believe the evidence the witness was about to give upon the main issue in the case. Morally, at least, if not legally, the witness was guilty of perjury and the respondent made himself her accomplice.

Either this respondent was guilty of gross professional misconduct or his effort to clear his client by what he knew to be false testimony entitles him to commendation. I see no middle ground, and no one, I believe, will consider that he should be commended.

I agree with the presiding justice that he should be disbarred.

CLARKE, P. J., SMITH and DAVIS, JJ., concurred.

PAGE, J. (dissenting):

I cannot give my assent to the opinions of my brothers CLARKE and SCOTT. A most careful and painstaking search has failed to reveal a single case in this or any other State that even remotely could be considered as a precedent for this decision. The cases cited in the opinion of the presiding justice all arise out of the misconduct of attorneys in civil actions.

The obligations of an attorney to court and client are very different in a civil and a criminal case. In a civil case an attorney is under no obligation to accept a retainer; in a criminal case, he may be assigned to defend a person whom he believes to be guilty and it is then his duty to defend. In a civil case, if it developes in the trial of the cause that his client has not a meritorious cause of action or defense, and that he has been deceived by. his client and the suit is not being prosecuted or defended in good faith, he is under an obligation

to so inform the court and withdraw from the cause. In a criminal prosecution, the attorney having accepted a retainer, believing in his client's innocence, he cannot withdraw even if his client confesses his guilt and demands that the attorney continue in his defense. And if the attorney should inform the court of the confession, it would be a grave breach of his duty. The distinction between the duty of attorneys in civil and criminal cases is clearly set forth in the " Canons of Ethics " adopted by the New York State Bar Association in 1909.

" 30. Justifiable and Unjustifiable Litigation.— The lawyer must decline to conduct a civil cause or to make a defense when convinced that it is intended merely to harass or to injure the opposite party or to work oppression or wrong. But otherwise it is his right, and, having accepted retainer, it becomes his duty to insist upon the judgment of the court as to the legal merits of his client's claim. His appearance in court should be deemed equivalent to an assertion on his honor that in his opinion his client's case is one proper for judicial determination.

" 31. Responsibility for Litigation.— No lawyer is obliged to act either as adviser or advocate for every person who may wish to become his client. He has a right to decline employment. Every lawyer upon his own responsibility must decide what business he will accept as counsel, what causes he will bring into court for plaintiffs, what cases he will contest in court for defendants. The responsibility for advising questionable trans-actions, for bringing questionable suits, for urging questionable defenses, is the lawyer's responsibility. He cannot escape it by urging as an excuse that he is only following his client's instructions."

Contrast these rules with rule 5: " The Defense or Prosecu-tion of Those Accused of Crime.— It is the right of the law-yer to undertake the defense of a person accused of crime, regardless of his personal opinion as to the guilt of the accused; otherwise innocent persons, victims only of suspicious circum-stances, might be denied proper defense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land per-mits, to the end that no person may be deprived of life or liberty, but by due process of law."

In Sharswood's " Professional Ethics " it is stated: "Every man, accused of an offense, has a constitutional right to a trial according to law; even if guilty, he ought not to be convicted and undergo punishment unless upon legal evidence; and with all the forms which have been devised for the security of life and liberty. * * * He is entitled, therefore, to the benefit of counsel to conduct his defense, to cross-examine the witnesses for the State, to scan, with legal knowledge, the forms of the proceeding against him, to present his defense in an intelligible shape, to suggest all those reasonable doubts which may arise from the evidence as to his guilt, and to see that if he is convicted, it is according to law. * * * It is not to be termed screening the guilty from punishment, for the advocate to exert all his ability, learning and ingenuity, in such a defence, even if he should be perfectly assured in his own mind of the actual guilt of the prisoner." (Pp. 90–92.)

Bearing in mind that the attorney here accused was engaged in defending a person accused of a crime of which he claimed to be innocent; applying the rules of ethics of the profession which have long been recognized as applicable to the conduct of attorneys in such employment, we will review the facts which fortunately are undisputed, and having been stated in the presiding justice's opinion, need not be here repeated in detail.

The respondent was retained as counsel for the defense, definitely, on the day preceding the trial, and had no prior connection with the case. On that date he had an interview with De Lane, and was informed that the Annette woman had made the charges against De Lane; that for sometime she had been kept by the district attorney in apartments in the Bronx, not having been detained as a witness in the house of detention or confined in prison; that she had left the city and De Lane had been in communication with her and could get her to return as a witness and that she would testify in his behalf. The respondent told De Lane to have her come down to New York. The next morning she appeared at the respondent's residence, and told him that she had never signed a statement for the district attorney; had never been a witness in any judicial proceeding nor gone before the grand jury.

Furthermore that she had never given De Lane any money and had so told the district attorney, but that he would not believe her. The presiding justice in his opinion states fully the happenings in court on the first day of the trial. In my opinion there was nothing in the conduct of the respondent which merits condemnation. If the witness had not been produced by him and had in fact been a material witness for the prosecution, it might have been argued that it would have been respondent's duty to have informed the district attorney that the witness was available, although I know of no duty that rests upon the counsel for the defendant to inform the district attorney of the whereabouts of his witnesses, especially when that information had been obtained by counsel from the accused. The district attorney had allowed the witness to remain at liberty, trusting to be able to produce her.

The witness was produced and sworn on behalf of the party in whose favor she testified. Of the purpose to produce her the district attorney had timely warning, so that he had the documentary evidence available for her cross-examination.

The learned referee has held that it was the duty of the respondent to have corrected the testimony of the Annette woman, which he knew to be false, i. e., that she had left Mayfield the night before because of the fact that she had seen mention of the trial in the Evening *Journal* and that no one knew of her coming. This view seems to have been adopted by a majority of this court.

An examination of the record does not show that a question was asked by the respondent for the purpose of eliciting this testimony. The witness, in answer to the question, "How did you get from Mayfield to New York?" answered, "Why, I came down on the New York Central and Hudson River; I came down on the train last night; I came down here because I read in the paper that Mr. De Lane's case — " Here the district attorney interposed: "I submit, your Honor, the witness be told to answer questions," and the court said: "Yes, please answer questions only. Repeat the question to her." The question being repeated, she answered: "I came down on the train." The respondent did not interrogate her further as to her coming to the trial. The only other reference to the witness having

come to New York that day, during the direct examination, was volunteered by the witness in response to the question of the respondent in reference to her talks with the district attorney, in which she said: "I never gave him [the defendant] a penny." Question. "Did you tell him that?" Answer. "I told him that, but he knew different; he knew lots of things and he had so many witnesses. Where are your witnesses? Bring them in and let them talk to me; these people that say he gave me money; they never seen nothing. Why don't you bring them in and let me talk to them. That is why I came here to-day; I did not have to come; nobody knew where I was to bring me here, but I came anyway." On cross-examination the district attorney went into the facts of her having left Mayfield the night before and as to the manner in which she had spent her time since her arrival. She was led into contradictions and improbable statements which demonstrated the falsity of her evidence on that point. On redirect examination the respondent did not ask any questions in relation to the matter either tending to correct the testimony in accord with the facts as he knew them, or to extricate her from the situation in which the witness had placed herself by her contradictory and improbable testimony. He left the matter, as it was, with the witness' testimony discredited for the triers of the fact to determine. Under the circumstances was he required to do more? The learned referee and the majority of the court say yes, he should have further discredited the witness by showing on this collateral and immaterial matter that the witness had deliberately and knowingly testified falsely. Had he done so there can be no doubt that it would have tended strongly to have destroyed in the minds of the jury credence in her testimony on the facts in issue. Yet, being false testimony as to an immaterial fact, under the rules of law they would not have been allowed to reject her testimony as a whole. He had not brought that fact into the case. He had presented a witness produced by his client to substantiate his defense. He had presented the evidence to the court. Without his solicitation the witness had volunteered false testimony of an immaterial fact. Bearing in mind that it was his duty to lay before the court the evidence his client claimed proved him not guilty, irrespective

First Department, December, 1916.            [Vol. 176.

of his own belief, can it be held that he holds himself personally liable for the truth of the testimony of the witness, even as to collateral matters, and that he must show the falsity of such statements, or render himself liable to be disbarred? If such a rule is to be enforced few lawyers will dare to defend one charged with crime. The question would constantly be presented to their minds: Shall I betray my client or shall I take the risk of disbarment? If it had been shown in this case that the respondent had advised the giving of this testimony, or had the testimony been brought out by him, knowing as he did that it was false, I should be with the majority of the court. A lawyer's duty to his client in a criminal case does not extend to the suggestion of false testimony even on a collateral matter. But there is not the slightest evidence in the record that he suggested in any manner the giving of the testimony, and as we have demonstrated the evidence was not elicited by him.

In the course of a long summation to the jury the respondent used one phrase that, under the circumstances of the case, was inexcusable. When, however, we read the entire summation, in my opinion, it cannot be said that this was a " deliberate and emphatic adoption by the respondent   *   *   *   of what he knew to be the false testimony of the Annette woman." In speaking of the two women who had appeared as witnesses for the prosecution and the Annette woman he said: " The Annette girl is a prostitute, and I am not asking you to believe the Annette girl. I believe, if you will permit me my opinion, they are three brazen hussies, if you want to know my opinion, I wouldn't believe them under oath." In that portion of his address that the offending phrase was used he said: " This woman is no white slave, in the sense that you and I understand white slaves to be. Do you believe, gentlemen of the jury, that that brazen hussey would have ever given away a dollar.   *   *   *   It would have been a different case here if you had an innocent unsuspecting little girl without any experience of the world, and she was led into a life of prostitution. It would be entirely a different thing, entirely different matter, but we have got her here, and thank God, gentlemen of the jury, that Divine Providence has brought that woman here. If

it was the Evening *Journal*, I thank the Evening *Journal*. If it was anybody else — she said it was the Evening *Journal* that she read it in, and by the way she produced a clipping to the judge if I am not mistaken, isn't that right, Judge. (The Court, Yes.) Thank God, I say, to the press." In closing, in commenting on his failure to call the defendant to the stand, he said: "I don't care how willing this defendant was to go upon the stand. I say that the prosecution in this case has failed to establish a case beyond a reasonable doubt, and it isn't worthy on the part of the defendant to contradict it. I say that by Annette's testimony, by her appearance upon the stand that there was sufficient to leave the case with you and with you alone, and the law says that a defendant has a perfect right to remain silent." This does not to my mind indicate that the respondent adopted and made his own the false testimony of the witness. Or that he presented her as a truthful witness to the jury. The phrase in which he thanked Divine Providence was unwarranted. Inspired by an excess of zeal in his client's behalf in the course of a long summation, without thought or consideration he used the phrase. In my opinion the utmost punishment that should be administered, if any, would be a censure. Disbarment carries with it the stigma that the conduct of the attorney has been such as to show him to be morally unfit to practice an honorable profession, and, should be pronounced only for such practices, where clearly disclosed by the record before the court. "Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument to its possessor. To most persons who enter the profession, it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the bar should, therefore, never be decreed where any punishment less severe — such as reprimand, tempora y suspension, or fine — would accomplish the end desired." (*Bradley* v. *Fisher*, 80 U. S. [13 Wall.] 335, 355.)

To my mind, my brethren have adopted a stricter rule than has ever been recognized by the courts or the profession at

large.    Seventy-five years ago there was a vigorous discussion in England, in the public press and in pamphlets, growing out of the defense of the murderer of Lord William Russell by a prominent barrister, Charles Phillips.    Mr. Phillips had accepted a retainer, believing in the innocence of the accused. On the second day of the trial the prisoner called his attorney and Mr. Phillips to the dock and informed them that he was guilty.    Mr. Phillips then said: "You will plead guilty," to which the prisoner replied: "No, and I expect you to defend me to the utmost of your ability."    In this situation Mr. Phillips consulted Baron PARKE, who was not sitting in the case. Baron PARKE informed him that he was bound to defend the prisoner, and to use all fair arguments arising from the evidence in his behalf.    The prisoner was convicted, and it afterwards transpired that the prisoner had confessed to his counsel, which led to a discussion of the duty of a lawyer under such circumstances.    Thereafter Mr. Phillips was appointed a commissioner by two different lord chancellors, and the fact of Baron PARKE'S advice became public by one of the lord chancellors having told of a conversation that he had with Baron PARKE, in which the baron had told him of his advice, and that he went into court and listened to the summation, and that Mr. Phillips' address was unexceptionable.    (See appendix to Sharpswood's Ethics and pamphlets issued in 1841.)

A comparison of Mr. Phillips' summation with that in the case at bar shows that Mr. Phillips went to greater lengths than did the respondent in the case under consideration.    However writers on moral philosophy and ethics may have differed from that time, the legal profession have recognized the duty of the lawyer in a criminal case to defend a client whom he knew to be guilty and to give him the benefit of all his skill and ability in presenting the defense by way of evidence and argumentation.    Never, until this case, has the tremendous responsibility for his utterance during a summation been suggested or imposed.

The references made above to the opinion of Mr. Justice SCOTT are not to the opinion handed down herewith, but to a short opinion in which he stated that "the deliberate and emphatic adoption by the respondent, in his summing up to the

jury, of what he knew to be the false testimony of the Annette woman, was the precise equivalent of false swearing himself." I do not consider it necessary to rewrite this opinion to make plain the misconstruction that Mr. Justice SCOTT in his present opinion seeks by word and innuendo to place upon my opinion. If it will bear such construction, I have been unfortunate in the use of language. He has sought to reinforce his first ground for disbarment of the respondent, *first*, upon the suspicion that the respondent coached and instructed the witness in the false testimony she gave. If there were any evidence tending to show such conduct, I would, as I have hereinbefore stated, agree with my brethren that the respondent should be disbarred. This is not the case of a Scotch verdict of not proven, but is a charge contained in the opinion which was not theretofore in the case. It was not litigated. This charge is of a most serious nature. It imputes fraudulent practices to the attorney, and on suspicion alone. It would hardly seem necessary in a case of this character to refer to such an elementary principle of law, that fraud is never to be presumed but must be established by clear proof.

*Second*, that the fraudulent testimony was developed by the skillful questions of the respondent. In another portion of this opinion I have reproduced from the record every question that was asked by the respondent, in answer to which the witness volunteered her false statement. I submit that the answer of the witness in those particulars was irresponsive; and, further, that not a question was asked, and answered, on the direct or redirect examination that tended to develop this false testimony.

There is a consideration, in addition to those mentioned by my brother SCOTT, which transcends the mere issues of this particular case, and that is: That an attorney charged with misconduct has the right to have the case determined on the record presented to the court. His case should be considered on the evidence, and not on suspicion; and determined on proof, and not on prejudice.

I do not palliate the respondent's misconduct in his summation, but I submit that a reprimand is sufficient punishment.

Respondent disbarred. Order to be settled on notice.