THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BARNEY FISHGOLD, Defendant.

County Court, Kings County, June 19, 1947.

*Maxwell E. Lopin* for defendant.

*Miles F. McDonald, District Attorney (James A. McGough* of counsel), for plaintiff.

GOLDSTEIN, J. On June 18, 1942, the defendant was found guilty of murder in the first degree, for the killing of one Michael J. Lary. That trial was held before me. The conviction was affirmed by the Court of Appeals (289 N. Y. 792), but on March 4, 1943, the defendant's sentence was commuted by His Excellency, Governor Dewey, to that of life imprisonment.

This is an application for a new trial. It is based primarily on affidavits of the three prosecution witnesses in which they recanted their testimony at the trial. In order that the very serious question involved might be fully heard and considered, I directed hearings to be held before me at which those witnesses were examined and cross-examined at great length by both sides. At those hearings, however, two of the prosecution's witnesses, Joseph Pilo and Louis Zollo repudiated their affidavits, and in substance, reaffirmed their testimony at the trial, as given on direct examination. The third witness, George D'Agostino, insisted that he had in fact not seen the defendant on the night of the killing; that he had so advised the Police Department and the District Attorney's office but that, nevertheless, he had been compelled to make statements and to testify otherwise before the Grand Jury and at the trial. This witness, however, even at the trial had not positively identified the defendant, having testified, '' I would not say I was positive it was him ''. The other two witnesses, however, positively identified the defendant as the individual who shot and killed the deceased. None of the arresting officers testified at the hearings before me.

After he signed the affidavit of recantation, the District Attorney's office held the witness Pilo in protective custody at a hotel for twenty-two days. This '' protective custody '' was somewhat anomalous in that his going and coming were entirely unrestricted, and his sole protection appears to have been a key to the hotel room. The hotel at which Pilo stayed is the one that he himself selected. The reason for his doing so, he claimed, was an alleged attack upon him by gunmen two days after he had been taken to the District Attorney's office in connection with the affidavit that he had made in support of this motion.

The other eyewitness, Zollo, also insisted that his testimony at the trial was correct, but also testified before me that he had first told the police that he knew nothing about the shooting of the deceased, but later changed his mind after talking to the police. At the trial he had testified that when the police first began to examine him he immediately told them that he saw the shooting. This witness, Zollo, was asked the following questions and gave the following answers at the trial.

'' Q. By the way, have you ever been convicted of crime?
A. No, sir.
Q. Never?
A. No, sir. I have one thing against me, but I was never convicted.

Q. Never convicted?

A. No."

Those answers were false. Defendant Zollo was charged with burglary in October, 1932, was found guilty of petit larceny on December 20, 1932, and received a suspended sentence. In his summation, the Assistant District Attorney relied heavily upon Zollo's testimony. He said to the jury as follows: " I am going to ask you to remember how Zollo acted and how he answered, and when you go into your jury room and decide this case, decide for a fact right at the beginning whether or not Zollo is an honest and truthful witness, and if you come to the conclusion that he is not, then cast his entire testimony to one side. Do not believe it. But if, on the other hand, you believe that he is honest and forthright and frank, then you take the testimony he gave and act on it."

In addition to the foregoing, the Assistant District Attorney had apparently been led to believe upon the basis of an erroneous report handed to him, that the defendant had been previously convicted of a number of other crimes, to wit, forgery and homicide. Upon the trial, he asked the defendant the following questions and received the following answers:

" Q. Now, where were you born and raised up until the time you were about eight or ten years old?

A. In Brownsville.

Q. Were you born in Brooklyn? A. Yes.

Q. Were you ever in the City of Buffalo, New York?

A. Never.

Q. Did you ever commit the crime of forgery in the second degree in Buffalo? A. Never.

Q. Did you ever go under the name of Theodore Lukowski?

A. I never did.

Q. Are you sure about it? A. I don't think I ever used that name.

Q. Do you remember whether or not you committed forgery in Buffalo? A. Never committed forgery.

Q. In 1938 or 1937? A. No.

Q. Did you ever cause the death of anybody by an automobile?

A. No."

In fact, the defendant had never been previously convicted of any crime, had never committed the crime of forgery, had never gone under the name of Theodore Lukowski, had never been in Buffalo, and had never caused the death of anybody by an automobile. It now conclusively appears that the criminal

record used by the Assistant District Attorney as a basis for his cross-examination of the defendant, was, unknown to the District Attorney, that of another person whose fingerprints resembled those of the defendant, and whose criminal record was therefore confused with the record of the defendant, which up to that time contained no convictions whatsoever.

In *Brower* v. *State* (26 Okla. Cr. 49, 54) the court said: " * * * a prosecuting attorney * * * represents the public; * * * he is * * * charged as much with the duty of seeing that no innocent man suffers as * * *. that no guilty man escapes. It is his duty to see that nothing but competent evidence is submitted to the jury, and it is a grave breach of duty for a prosecuting attorney to seek by innuendo or artifice to procure a conviction by injecting into the case * * * facts or conclusions not based upon the evidence adduced at the trial."

In *State* v. *Haney* (222 Minn. 124, 125) the court said: " An accused, whether guilty or innocent, is entitled to a fair trial, and it is duty of the court and of prosecuting counsel as well, to see that he gets one. There must be no conduct, either by argument or by asking of irrelevant questions, the effect of which is to inflame the prejudices or excite the passions of the jury against the accused."

While it is unquestionably true that the defendant denied the commission of the crimes imputed to him by these questions, nevertheless it would be absurd to suppose for one moment that the jury believed those denials. Every jury knows that the prosecuting officer occupies an office and possesses powers which enable him to obtain the criminal record of any individual, whether he be a witness or a party. By incorporating the Lukowski record into his questions, the District Attorney provided an occasion for the jury's disbelief of the defendant's denials — a disbelief which may well have affected the result. When an attorney for a private litigant asks similar questions, knowing full well that there is no basis for them, he commits a censurable offense, for no lawyer may put a question to a witness which imputes a crime to him, if that attorney knows that no such crime was in fact committed by the witness. In *Matter of Palmieri* (176 App. Div. 58, revd. on another ground 221 N. Y. 611) Justice Scott, in a concurring opinion, said (p. 66): " There is no recognized rule of law or ethics which justifies the conduct of counsel in any case, civil or criminal, in endeavoring by dishonest means to mislead the court or jury, even if to do so might work to the advantage of his client "

and such conduct will constitute a ground for suspension or disbarment.

Even then, the harm in a civil case cannot possibly be as great because the jury, as men of experience, know that an attorney, as distinguished from a public prosecuting officer, may be in error about his information concerning a witness' criminal record. But not so with a prosecuting officer. The jury is entitled to, and does in fact put, implicit faith in him, and in what he says or implies by his questions. They are fully aware of his fact-finding facilities and quite reasonably base their deliberations and opinions concerning testimony given in response to his questions upon that premise. Here, of course, as I have indicated, the questions were put to the defendant in error — an honest error. But, nevertheless, the harm was done. In *People* v. *Crapo* (76 N. Y. 288, 290–291) the court said concerning a defendant who testified in his own behalf: "He goes upon the stand under a cloud; he stands charged with a criminal offence, not only, but is under the strongest possible temptation to give evidence favorable to himself. His evidence is therefore looked upon with suspicion, and distrust, and if in addition to this he may be subjected to a cross-examination upon every incident of his life, and every charge of vice or crime which may have been made against him, and which have no bearing upon the charge for which he is being tried, he may be so prejudiced in the minds of the jury as frequently to induce them to convict, upon evidence which otherwise would be deemed insufficient."

In *People* v. *Malkin* (250 N. Y. 185, 197–198) the court said: "The court may not close its eyes to results which are intended to flow and do flow from the question itself. We will not say that denial, made by a defendant on cross-examination, of misconduct in a collateral matter renders harmless a question which is ' asked for the improper purpose of planting in the minds of the jury suspicion and distrust by insinuations that the defendant has falsely denied his guilt as to collateral matters.' (*People* v. *Slover,* 232 N. Y. 264.) The error in this case in permitting the District Attorney to question Mencher about the suspension or expulsion of the local union, in which the defendants were associated, from the American Federation of Labor was intensified by the admission of subsequent questions phrased in manner to suggest, in spite of denial, that disciplinary action was taken because of habitual use of violence."

And at page 201, the court said: "The Law draws a distinction between the effect which may be given to a charge of mis-

conduct and to proof of misconduct; between the effect of admission of misconduct elicited upon the cross-examination of a defendant to impeach his credibility as a witness, and affirmative proof of misconduct on other occasions as a relevant factor in the determination of the guilt of a defendant of the crime for which he is being tried. Experience and common sense alike must lead to the conclusion that juries often disregard such distinctions. (See 2 Wigmore on Evidence, § 981.)''

In *People* v. *Rechichi* (246 App. Div. 679) in the dissenting memorandum it was said: '' In his cross-examination of the defendant the experienced district attorney so phrased many of his questions as to accuse defendant of having committed several serious crimes other than the one for which he stood charged. Later in his summation to the jury the prosecutor forcefully repeated these accusations. This line of attack — against which the defendant was helpless except through mere categorical denials — went so far beyond the proper limitations set upon cross-examination in our law and practice as to be decidedly unfair and highly prejudicial to the defendant.''

The use of the Lukowski record was therefore a serious errror that cannot be disregarded.

Another element in my conclusion is the fact that when a District Attorney places a witness on the stand whose criminal record he should or could have known about, he is under an affirmative duty of disclosing that fact to the jury as an element in the jury's consideration on the question of that witness' credibility. Particularly is that the case where the result of the case will turn upon the jury's belief or disbelief of that particular witness. As another Judge of this court recently wrote: '' A prosecutor is not a mere partisan in a criminal proceeding. He occupies the position of ' a quasi judicial officer, representing the people of the state, and presumed to act impartially in the interest only of justice.' *People* v. *Fielding*, 158 N. Y. 542, 547 * * *; see, also, *Berger* v. *United States*, 295 U. S. 78, 88 * * *. It is his duty, in the interest of justice, to present to the grand jury all the material evidence in his possession, in order that the grand jury may make a proper appraisal of the credibility of the witnesses who are called before them to testify.'' (*People* v. *Santoro*, 63 N. Y. S. 2d 615, 618–619, LEIBOWITZ, J.)

The duty of the District Attorney to present to the trial jury all of the material evidence in his possession in order that they may make a proper appraisal of the credibility of the witnesses who are called before them to testify, is even greater than his

duty to do so before the Grand Jury, for on that occasion the defendant's liberty is at stake. The United States Supreme Court said, in *Berger* v. *United States* (295 U. S. 78, 88): " The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

" It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

While it is true that the deceased, Michael Lary, had a long criminal record, that fact would have been of no importance upon the trial of the defendant and I have given it no consideration in reaching my conclusions. The court is also fully cognizant of the crimes which it is alleged the defendant committed subsequent to his indictment for the killing of Michael Lary. However, those are matters which do not concern the court at the present time in the determination of this motion.

The errors that I have adverted to are serious. They reflect upon the very administration of justice. They require a new trial in the interests of justice. It is important to remember that such a result has followed even where the defendant had confessed to the crime with which he was charged — which is not the case here. See, for example, *People* v. *Slover* (232 N. Y. 264, 269, *supra*) where the Court of Appeals said: " In summing up the district attorney attacked the credibility and good character of defendant vigorously and at length. A weak case thus fortified might result in a conviction on the strength of collateral matters, insinuated and not proved." (See, also, *People* v. *Esposito*, 224 N. Y. 370.)

In *People* v. *Nuzzo* (294 N. Y. 227, 235-236) the court said: "Thirty years ago this court had occasion to comment upon abuses on the part of prosecuting officers and carelessness on the part of trial courts in disregarding errors of major importance in the trial of criminal cases whenever the judge was satisfied that the defendant was guilty. We are prompted by our examination of records in this court disclosing many shocking instances of abuse on the part of prosecuting officers which we have been asked to ignore, to say again what was said in *People* v. *Marendi* (213 N. Y. 600, 619-620):

" ' Are we then to disregard errors no matter how substantial, if upon a review of the evidence we are satisfied with the verdict of the jury? Such a course will simply mean in the long run the abolishing of all forms of law taught by experience to be necessary to the protection of the innocent and the decision of criminal cases on appeal solely on the facts. If trial by jury is to be maintained, the right of every accused person to be tried in accordance with established forms of law must be respected. If the errors in question had related to matters upon which but one decision, and that adverse to the defendant, could reasonably have been reached, it might be permissible to overlook them; but where prejudicial matter is erroneously received in evidence on a disputed question of fact, its harmful character cannot be determined solely by the mere weight of competent evidence unless we are to resolve ourselves into a jury and, ignoring the finding upon incompetent evidence, substitute one upon the evidence which we may deem competent.

" ' In this case highly prejudicial matter was received in evidence on a vital issue in utter disregard of a fundamental rule of evidence firmly established in our jurisprudence, and the jury were permitted to find the defendant guilty of murder in the first degree on a theory which ought not to have been submitted to them, whereas they might reasonably have found a verdict in a lesser degree on the rightful theory. Under those circumstances we cannot affirm without establishing the rule that the forms of law need not be respected if the evidence convinces us of the defendant's guilt. We are not prepared to establish such a rule.' No two cases are quite the same but the case at bar is plainly one in which we may not overlook the highly prejudicial manner in which the prosecution was conducted."

The sharp and difficult question of credibility of the witnesses was for the jury to determine. It was clearly misled — and innocently so — on that issue. His Excellency, Governor Dewey,

apparently also had serious doubt concerning that issue, particularly as to the question of intoxication. In his memorandum commuting the defendant's sentence to life imprisonment, His Excellency, the Governor, said: " Fishgold until a few hours before this act led an exemplary life. He deteriorated only after separation from his wife. Excessive drink was part of and a contribution to his deterioration. It is indisputable from the record that he had been drinking heavily for many hours before the killing of the deceased. He had been ejected from a bar by the owner, assisted by the deceased and others. Apart from the assistance by the deceased in ejecting Fishgold there was no other evidence of a motive for the crime. The examination of the witnesses at the trial, by both prosecution and defense, was highly unsatisfactory both from the point of view of developing a motive for the crime or the capacity of the defendant for premeditation. Evidence of the fact of the killing was, however, incontrovertible. The Court of Appeals could but affirm the conviction. But on the record I cannot banish the uncertainty in my mind whether the act was done with the premeditation and deliberation which exacts the punishment of death."

Since the witnesses are still alive and readily available, a new trial may be had without undue hardship to the People.

I have given this matter serious thought and consideration for many months before I arrived at the conclusions expressed herein, and I am convinced that any other course would only serve to cast discredit upon the administration of justice and violate the conscience of the court.

This motion is accordingly granted; the judgment of conviction is set aside and a new trial ordered, and the District Attorney of Kings County is directed that it be placed on trial before another judge of this court at an early date.