THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* SAMUEL A. NUZZO, Appellant.

Argued November 29, 1944, reargued March 9, 1945; decided May 24, 1945.

*Henry Hirschberg* for appellant. I. Evidence was illegally introduced regarding defendant's relations and other crimes committed with Jennie Utter. (*People* v. *Molineux,* 168 N. Y. 264; *People* v. *Wansker,* 191 App. Div. 875; *Stewart* v. *State,* 184 Ind. 367.) II. The trial court committed reversible error in refusing to charge that the minute books of the local were not the corroboration of the accomplice Smith necessitated by section 399 of the Code of Criminal Procedure and by refusing to charge that Smith's long hand notes of the meetings were not such corroboration. (*People* v. *Felber,* 264 App. Div. 181; *People* v. *Feola,* 284 N. Y. 381; *People* v. *Goldstein,* 285 N. Y. 376; *People* v. *Maione,* 284 N. Y. 423; *People* v. *Edwards,* 282 N. Y. 413; *People* v. *Louise,* 242 App. Div. 471; *People* v. *O'Farrell,* 175 N. Y. 323; *People* v. *Elbroch,* 250 App. Div. 583; *People* v. *Nitzberg,* 287 N. Y. 183; *People* v. *Kinney,* 202 N. Y. 389; *People* v. *Collier,* 141 App. Div. 111; *People* v. *Kress,* 284 N. Y. 452.) III. Defendant's constitutional rights to due process of

law guaranteed him by section 1 of article 6 of the State Constitution and by the 14th Amendment to the United States Constitution were violated, in that the trial court denied him the right to prove that the grand jury returning the indictment had been illegally organized pursuant to a conspiracy excluding from said grand jury all qualified prospective grand jurors of defendant's class, i.e. those connected directly, or indirectly, with organized labor. (*People ex rel. Nuzzo* v. *Truesdell,* 265 App. Div. 886; *The People* v. *Petrea,* 92 N. Y. 128; *Carter* v. *Texas,* 177 U. S. 442; *Norris* v. *Alabama,* 294 U. S. 587; *Strauder* v. *West Virginia,* 100 U. S. 303; *Mamaux* v. *United States,* 264 F. 816.)

*Nathaniel L. Goldstein, Attorney-General* (*Stanley H. Fuld, Irving Galt, Saul A. Shames* and *John F. Tucker* of counsel), for respondent. I. The court correctly instructed the jury with respect to corroboration of the accomplice Smith's testimony regarding the forgeries in the minute book, and properly declined to charge further on that subject with reference to specific items of evidence singled out by counsel. The court was not bound to subdivide its instructions on corroboration and charge separately with reference to specific evidence selected by counsel. (*People* v. *Radcliffe,* 232 N. Y. 249; *People* v. *Tuczkewitz,* 149 N. Y. 240; *People* v. *Weisenberger,* 73 App. Div. 428; *The People* v. *McCallam,* 3 N. Y. Cr. R. 189, 103 N. Y. 587; *People* v. *Maione,* 284 N. Y. 423; *People* v. *Felber,* 264 App. Div. 181.) II. Defendant received a fair trial free from prejudicial error. The examination of Jenny Utter was proper. III. The Grand Jury was properly selected. In any event, even if the court had improperly excused the talesmen, the resulting Grand Jury was validly constituted and the indictment subsequently returned was legal and sufficient. *People* v. *McGonegal,* 136 N. Y. 62; *United States* v. *Jones,* 69 F. 973; *State* v. *Guthrie,* 185 Wash. 464; *State* v. *Westcott,* 194 Wis. 410; *State* v. *Codington,* 80 N. J. L. 496, 82 N. J. L. 728; *Territory* v. *Barth,* 2 Ariz. 319.)

THACHER, J. The defendant was tried upon two consolidated indictments containing eight counts for grand larceny in the first degree, thirteen for grand larceny in the second degree, one for petit larceny and thirteen for forgery in the third degree. The

court dismissed two of the counts of grand larceny in the second degree and reduced one count of grand larceny in the second degree to petit larceny. The jury acquitted the defendant on one count of grand larceny in the second degree and found the defendant guilty upon all the remaining counts. There was a third indictment filed against the defendant which contained fifty-four counts charging various grand larcenies, some in the first and some in the second degree. This indictment was never moved for trial. A large part of the record of the trial of the consolidated indictment was taken up with the introduction of evidence to show that the defendant committed the crimes alleged in this untried indictment as well as many other crimes not specified in any of the indictments.

All the offenses as to which evidence was given upon the trial arose out of the defendant's administration of his office of financial secretary and business agent of a labor union, Local 17 of the International Hod Carriers' Building and Common Laborers' Union of the American Federation of Labor. The affairs of this union were investigated by the Attorney-General (pursuant to directions of the Governor) and the indictments followed this investigation.

In affirming the defendant's conviction the Appellate Division in a brief memorandum based its decision upon section 542 of the Code of Criminal Procedure, thus indicating errors in the trial which it felt constrained to disregard as not affecting the substantial rights of the defendant. This court is agreed that the evidence was sufficient to support the verdict of the jury and that errors were committed in the course of the trial.

As part of their main case, the People called as a witness Mrs. Jennie C. Utter, who testified, over objection and exception, that she accompanied the defendant on trips to conventions of the American Federation of Labor at Atlantic City, New York City and St. Louis; she further testified that she took a trip to Florida with the defendant in January, 1940; that on each one of these trips she stayed in the hotel where the defendant stayed and her expenses were all paid by him; that while they were in Florida together he flew with her to Cuba for a three-day trip and, returning to Miami Beach, he purchased for her a silver fox coat costing $350. The circumstances disclosed by her examination plainly suggested that her relations with the defend-

ant were improper, and it is admitted by the Attorney-General that her testimony relating to the trips which she made with the defendant to St. Louis and to New York should not have been received. The Attorney-General also concedes that if the testimony of this witness were introduced to prove an illicit or meretricious relationship it would have been improper, but asserts that the evidence was adduced solely to discredit the defendant's claim that local funds had been used for union purposes, the defendant having told the Grand Jury prior to his indictment that he had spent $1,500 legitimately in Atlantic City for ten or twelve bodyguards and had paid one Wallace $500 properly while he was vacationing in Florida. If Mrs. Utter's testimony had shown that the defendant's testimony before the Grand Jury with reference to the expenditure of union funds was false, then it would have been competent and highly material. It showed nothing of the kind. Her only testimony relating to bodyguards was that she was never present when the defendant had a conversation concerning bodyguards and she did not hear him discuss them. There was nothing to show that she was present when such matters might have been discussed. The Attorney-General asserts that Mrs. Utter furnished testimony strongly suggesting that the union's money went to cloak her with a $350 fur coat. Certainly there is nothing in her testimony to show that she had any knowledge whatever as to the source of the money which the defendant spent in making this purchase. The defendant testified: " Q. While you were down there [in Florida] did you and Mrs. Utter and Angelo Tudico fly over to Cuba? A. Yes, sir. Q. Did Mrs. Utter go as your guest? A. Yes, sir. Q. How long were you in Cuba? A. Three days. Q. And was it before you went or after you came back that you telegraphed to Helen Ronk for the $500? A. I believe it was after I came back. Q. And how much money did you take with you on that trip, Mr. Nuzzo? A. I had about $500, I believe, $600." The defendant admitted he had bought a silver fox coat for Mrs. Utter costing $350, but testified: " Q. Now, on this $500 that you got by telegraphing did you give all of that to Wallace? A. Yes, sir." It is upon this testimony that the Attorney-General attempts to support his assertion that union funds were used to pay for the fur coat.

Upon this record we are constrained to conclude that there was no legitimate purpose in calling Mrs. Utter as a witness and we are confirmed in this view by the use made of her testimony by the Attorney-General in his summation to the jury. The following comments were made: " In 1939, August, I believe, Nuzzo has got to go to Atlantic City, to a meeting of the International Executive Board; so Sam and Mrs. Utter go down to Atlantic City." And again, with reference to the convention in New York: " So they all go down to New York with Mrs. Utter to the convention." " Well, in January, 1940, they are. going to town on this organization, and what do these books show? In January, 1940, that is just before Sam and Mrs. Utter went to Florida, * .* * ." " ' Come on, Mr. Tudico, my brother-in-law, married to my wife's sister. Come on, Mrs. Utter to Florida.' Mrs. Utter as Mr. Nuzzo's guest. Strathaven Hotel, Miami Beach. A week. ' Come on, Tudico. Come on, Mrs. Utter. No, we won't take a boat. Let us fly over to Cuba for three days,' and we come back. $500. That is all he has got. $500. He traveled down by train state rooms, plural, I mean, Strathaven Hotel, Miami Beach, fly to Cuba, three days, $500. He is back. ' Hello, Newburgh.' Is this Miss McKay? Send me down $500, Western Union. I will tell you what it is for when I come back.' * * * And Mrs. Utter gets a silver fox coat for $350. It is not denied but admitted by Nuzzo on cross examination. Take $350 from $500 and you have not got much left." " Oh, I could go on. I could take you to St. Louis, take Mrs. Bilyeu and Mr. Bilyeu and Mr. Russell and Mrs. Utter and Sam, take you to St. Louis and spend $2,500 of the union's money, but I won't take up your time, you remember it as well as I do."

It is not without significance that the testimony is said to have been introduced to discredit testimony already given by the defendant, not upon the trial but before the Grand Jury, although it had no such effect. What she said about the bodyguards did not discredit the defendant's testimony that such guards were employed and paid and her testimony that the defendant had spent $350 for the coat discredited nothing in defendant's testimony.

It is the established rule that specific acts of a defendant in a criminal trial, unrelated to the offense with which he is charged

but tending to show his bad character, may only be proven by his own admissions on cross examination if he chooses to give testimony and then only to the extent that such acts tend to impeach his credibility as a witness. (*People* v. *Webster*, 139 N. Y. 73, 84.) Nor does he put his general character in issue by taking the stand unless 'he introduces affirmative proof of good character. (*People* v. *Richardson*, 222 N. Y. 103, 107; *People* v. *Hinksman*, 192 N. Y. 421.) These rules of fundamental fairness in the protection of the individual against unjust prosecutions are inflexibly enforced in our courts (*People* v. *Zackowitz*, 254 N. Y. 192), and we may not overlook their breach as not affecting the substantial rights of the defendant within the meaning of section 542 of the Code of Criminal Procedure when the purpose and effect of the breach is to create prejudice against the defendant by proof that his character is bad, even if the evidence convinces us of the defendant's guilt. (*People* v. *Marendi*, 213 N. Y. 600, 620.) Nor may these rules be perverted by erroneously receiving proof of bad character as part of the People's case and purging the error on appeal because the defendant later took the stand. (*People* v. *Zackowitz, supra.*) At no stage of the trial in this case could the testimony of Mrs. Utter that she made several extended trips with the defendant, at his expense and under circumstances highly suggestive of improper relations, have been properly received in evidence.

The forgery counts were based upon the testimony of Harold S. Smith, a former secretary of Local 17, who testified that minutes of certain motions had been inserted in the minute books as forgeries by him at the instance and request of the defendant. This was denied by the defendant who called a number of witnesses to testify that they heard the proceedings on the motions which Smith had testified he had thus fabricated. Other witnesses called by the State gave corroborative testimony tending to connect the defendant with the forgeries. The Trial Justice instructed the jury that Smith was to be considered an accomplice as a matter of law and read the provisions of section 399 of the Code of Criminal Procedure requiring such testimony to corroborate an accomplice. This general charge was correct but the documentary evidence in Smith's original notes and in the minute books themselves was not mentioned and the jury was left to decide for itself the legal question whether such

documents were corroborative evidence within the requirement of the statute.

Counsel for the defendant requested specific charges that neither the minute books themselves nor Smith's original notes could be regarded as corroboration under the statute. Both requests were declined and exceptions taken.

The Attorney-General admits that these records could not be taken in corroboration of the accomplice and rests upon the proposition that, the general charge being correct, the court was not required to go farther, citing *People* v. *Radcliffe* (232 N. Y. 249). It takes but little thought to realize how persuasive a contemporary written record may be in establishing the facts recorded. These records must have had that effect and were in common understanding corroborative of the testimony of Smith, although inadequate as corroboration in the statutory sense because they in no way connected the defendant with the forgery. Under these circumstances the defendant was fairly entitled to an instruction upon the legal effect of such records in supplying or failing to supply the necessary corroboration. The rule of convenience which justifies a court in refusing to charge specifically with reference to items of evidence as to which a general charge has already been made, as applied, for example, in *People* v. *Radcliffe* (*supra*), can have no application here. The request was directed to a question of major importance in the consideration of the forgery counts which we are not satisfied was sufficiently clarified by the general charge. There would have been no inconvenience whatever in granting the requests and they should have been granted.

Thirty years ago this court had occasion to comment upon abuses on the part of prosecuting officers and carelessness on the part of trial courts in disregarding errors of major importance in the trial of criminal cases whenever the judge was satisfied that the defendant was guilty. We are prompted by our examination of records in this court disclosing many shocking instances of abuse on the part of prosecuting officers which we have been asked to ignore, to say again what was said in *People* v. *Marendi* (213 N. Y. 600, 619–620):

" Are we then to disregard errors no matter how substantial, if upon a review of the evidence we are satisfied with the verdict of the jury? Such a course will simply mean in the long run

the abolishing of all forms of law taught by experience to be necessary to the protection of the innocent and the decision of criminal cases on appeal solely on the facts. If trial by jury is to be maintained, the right of every accused person to be tried in accordance with established forms of law must be respected. If the errors in question had related to matters upon which but one decision, and that adverse to the defendant, could reasonably have been reached, it might be permissible to overlook them; but where prejudicial matter is erroneously received in evidence on a disputed question of, fact, its harmful character cannot be determined solely by the mere weight of competent evidence unless we are to resolve ourselves into a jury and, ignoring the finding upon incompetent evidence, substitute one upon the evidence which we may deem competent.

" In this case highly prejudicial matter was received in evidence on a vital issue in utter disregard of a fundamental rule of evidence firmly established in our jurisprudence, and the jury were permitted to find the defendant guilty of murder in the first degree on a theory which ought not to have been submitted to them, whereas they might reasonably have found a verdict in a lesser degree on the rightful theory. Under those circumstances we cannot affirm without establishing the rule that the forms of law need not be respected if the evidence convinces us of the defendant's guilt. We are not prepared to establish such a rule." No two cases are quite the same but the case at bar is plainly one in which we may not overlook the highly prejudicial manner in which the prosecution was conducted.

Serious complaint is made by the defendant because of the large volume of testimony introduced upon the trial relating to charges of crime other than those contained in the indictments upon which the defendant was being tried. The Attorney-General contends that all this evidence was admissible upon the issue of felonious intent. The defendant contends that the issues were such that this evidence of collateral transactions could have no probative force in establishing defendant's actual guilt of the crimes for which he was tried save as it may have shown a predisposition to steal, and that it was prejudicial error to receive it, citing *People* v. *Mullens* (292 N. Y. 408, 418). In view of the mass of such evidence offered in this case the decision in the *Mullens* case may well be important, but we need not consider

this and other questions which were argued but have not been discussed in this opinion because they may not arise on another trial or, if they do, may require consideration in a different setting.

One objection of the defendant if sustained would require dismissal of the indictment. It relates to the selection of the members of the Grand Jury which indicted the defendant and the contention is that the Grand Jury was illegally organized pursuant to a conspiracy to exclude qualified prospective grand jurors. The defendant asserts a " deliberate and intentional exclusion of all duly qualified prospective grand jurors of the same class and occupation as appellant " in violation of appellant's constitutional rights guaranteed by article I, section 6, of the Constitution of the State of New York and by the Fourteenth Amendment to the Constitution of the United States. The examination of prospective grand jurors upon the *voir dire* is presented in this record from which it appears that no prospective jurors were excluded from the Grand Jury other than several who were excused upon their own request, one because he was over seventy years of age, one for bias whose testimony in regard to activities as a union official was shown to be false and another whose son-in-law belonged to a union which the Attorney-General stated was " bound to be involved directly or indirectly " in the investigation and who was excused by the court when he stated that he " would just as soon be excused ". In connection with this challenge the court stated its desire to avoid any possibility of embarrassment to any talesman. We find in these proceedings no reason for dismissing the indictment, nor any grounds for taking proofs of conspiracy improperly to exclude any qualified person from the Grand Jury. The challenges sustained by the court were properly sustained in the exercise of the court's discretion.

The judgments should be reversed and a new trial ordered.

LEHMAN, Ch. J., LOUGHRAN, LEWIS, CONWAY and DYE, JJ., concur; DESMOND, J., dissents and votes to affirm the judgment under the provisions of section 542 of the Code of Criminal Procedure.

Judgments reversed, etc.