[Crim. No. 10533. In Bank. July 20, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JIMMIE LEE ROSS, Defendant and Appellant.

66

Jimmie Lee Ross, in pro. per., and Bertram H. Ross, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—Defendant appeals from a judgment of conviction of (a) robbery in the first degree and (b) attempted murder.

*Facts*: Walter Williams, general manager of a San Bernardino ice cream company, was in his office about 10 p.m. on September 20, 1964, counting daily receipts. A company driver, Mr. Asa Brown, was present. A person later identified as defendant appeared at the door and declared, "This is a stickup, Walt." Mr. Williams, known by that nickname, had never seen the person before. The intruder wore black shoes, dark trousers, a zippered jacket, gloves, and a woman's nylon stocking over his head. He was carrying a single-barreled shotgun with tape around it. The gun was pointed at the head and chest of Mr. Brown seated at the office desk.

The intruder ordered the two employees to get down on the floor and face the wall. They complied with the order, although Williams continued to face in the direction of the intruder and was thus able to observe the thief take an unknown amount of currency from the desk and place it in his pocket. The thief then said, "Let's go to the safe room." The employees were ordered to open the safe and to again get down on the floor.

The neon lights in the room were defective and occasionally flickered, prompting the thief to say; "What is that? Who turned that light on? You know, if anybody walks through that back door now, he is a dead man." The thief reached into the safe for a large sack of money, and finding it too heavy to lift with one hand he placed the shotgun on the floor to use both of his hands. Williams yelled, "Let's get him," and the employees rushed the intruder. The thief was able to regain possession of the gun and used it as a club, striking Williams repeatedly on the head, arms and body. During the scuffle with their assailant, both employees were able to closely observe his features despite the stocking. They later positively identified defendant as the robber.

Mr. Brown broke away to call the police, while Williams continued the struggle, but the thief was able to escape with a sack containing rolled money and currency. Williams later estimated the entire amount taken was approximately $800.

As the thief fled he warned "Don't come any closer or I will shoot." Nevertheless, Williams and Brown followed him outside and saw him retreating with the shotgun and a traveling bag. The thief pointed the gun at them and ordered, "Don't try to follow; get back." After the robber disap-

peared from view, Williams advanced to the corner of the building and observed a person he believed to be the thief behind an automobile approximately 100 feet away. He next heard a blast from a shotgun and felt pellets strike both legs.

Police officers arrived shortly thereafter, and during their investigation they found coins lying on the street where the shot was fired. Bystanders provided a description of the suspect's automobile, and Brown described the physical characteristics of the thief. This information was transmitted by radio to a police dispatcher, who alerted all units.

About 10:40 p.m. a vehicle answering the radio description was sighted by a San Bernardino police patrol unit. The officers immediately attempted to halt the vehicle with a red light and siren. Instead of stopping, the driver accelerated and attempted to evade pursuit. Realizing the fleeing automobile was not going to stop, the officers fired seven shots during the ensuing pursuit, to which the suspect responded with a shotgun blast. During the pursuit the officers were able to observe that the driver of the vehicle wore a white shirt and red vest.

During the chase the officers were in radio contact with other police units, and when the pursuit reached the jurisdictional border of the neighboring community of Colton, an alerted police unit was waiting to intercept. The latter took over with red light, siren and spotlight. The driver of the suspect vehicle leaned out of the car window and swung a taped, sawed-off shotgun towards the pursuing Colton police approximately two car lengths behind. The officer beamed his spotlight directly into the suspect's face and slid down on the front seat. He saw a flash and heard the report of the shotgun. Pellets struck the police vehicle, breaking a headlight, puncturing the radiator, and richocheting off the windshield. Pursuit, however, continued until the escape route became blocked by gates to a mill yard entrance. The suspect increased his speed and broke through, but further progress was prevented by a variety of materials stacked in the yard. As the suspect jumped from his vehicle, the officer trained a spotlight directly on the fugitive, who looked back toward the light, enabling the officer to observe at close range his face and profile. The officer later positively identified defendant as the person pursued.

The suspect began to run despite an order to halt. The officer returned to the police unit and radioed a report in

which he described the suspect as blond, wearing a white shirt, tie, dark trousers and a bright red vest.

A San Bernardino police vehicle, who had been monitoring the chase by radio and heard the description, observed a man in a white shirt, black pants and a red sweater vest walking across an open field. He was carrying a necktie in his hand, his clothes were disheveled, and he appeared to be tired. Defendant was arrested and transported to the San Bernardino city jail. An examination was made of the suspect vehicle, identified as belonging to defendant. Officers discovered therein $131 in currency, $298 in rolled coin, $154.23 in loose coin, five money bags, shotgun shells, numerous articles of clothing, a traveling bag, and a pair of gloves. The money bags contained daily receipts and stamped coin wrappers identified as belonging to the plundered ice cream company. Also recovered was a check bearing the endorsement of Asa Brown which he had cashed and placed in the company safe prior to the robbery. Approximately 100 feet from defendant's abandoned vehicle, officers found a sawed-off shotgun with white tape on the barrel.

The day following the robbery Brown was requested to view a police showup, and he identified defendant as the thief from a lineup of four persons.

*Questions*: First. *Was the incidental search of defendant's person proper?*

*Yes.* ■ It is axiomatic that a search of the person incidental to a lawful arrest is valid. (*United States* v. *Rabinowitz*, 339 U.S. 56, 60, 64 [94 L.Ed. 653, 657, 659, 70 S.Ct. 430]; *Agnello* v. *United States*, 269 U.S. 20, 30 [70 L.Ed. 145, 148, 46 S.Ct. 4, 51 A.L.R. 409]; *People* v. *Simon*, 45 Cal.2d 645, 648 [2a] [290 P.2d 531]; *In re Dixon*, 41 Cal.2d 756, 761-762 [9] [264 P.2d 513].)

A peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person to be arrested has committed a felony. (Pen. Code, § 836, subd. (3).) ■ "Reasonable cause" is defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (*People* v. *Ingle*, 53 Cal.2d 407, 412 [2] [2 Cal.Rptr. 14 348 P.2d 577]; *People* v. *Fischer*, 49 Cal.2d 442, 446 [1] [317 P.2d 967].) ■ No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circum-

stances presented to the officers at the time they were required to act. (*People* v. *Ingle, supra,* at p. 412 [1]; *People* v. *Ferguson,* 214 Cal.App.2d 772, 775 [4] [29 Cal.Rptr. 691].)

The arresting officers, through official radio communication, were fully apprized of the commission of an armed robbery; they had a description of the car, which they had pursued until the Colton police took command; they also had a detailed description of the driver from the Colton police and they knew that the pursuit had terminated at the mill yard. They were entitled to rely on information from official sources. (*People* v. *Estrada,* 234 Cal.App.2d 136, 152 [11] [44 Cal.Rptr. 165, 11 A.L.R.3d 1307]; *People* v. *Schellin,* 227 Cal.App.2d 245, 251 [7] [38 Cal.Rptr. 593].) Shortly thereafter, while patrolling in the vicinity of the mill yard, the officers observed defendant walking through an open field; his description matched precisely that given by the officer who had him in the spotlight; his clothes were disheveled, and he appeared tired. The arresting officers clearly had probable cause to arrest defendant, and the incidental search of his person was, therefore, valid. (*Brinegar* v. *United States,* 338 U.S. 160, 175-176 [93 L.Ed. 1879, 1890-1891, 69 S.Ct. 1302]; *People* v. *Schader,* 62 Cal.2d 716, 722 [2a], 725 [2b] [44 Cal. Rptr. 193, 401 P.2d 665].)

Second. *Was the seizure of defendant's personal effects, including money found on his person, lawful?*

*Yes.* A search of an arrested person at the time of his booking has always been considered contemporaneous to his arrest and is a reasonable search. His personal effects may be removed from him; the police may examine them to see if they have been stolen, return them to the prisoner on his release, or preserve them for use as evidence at the time of trial. (*People* v. *Rogers,* 241 Cal.App.2d 384, 389 [7-8] [50 Cal.Rptr. 559]; *People* v. *Wickliff,* 144 Cal.App.2d 207, 213 [6] [300 P.2d 749]; *Bruce* v. *Sibeck,* 25 Cal.App.2d 691, 697-698 [3] [78 P.2d 741].)

Section 1412 of the Penal Code provides that when "money or other property" is taken from an arrested defendant the officer taking it must give a receipt therefor. This statutory requirement necessarily assumes that "money or other property" may be lawfully seized from one arrested for a crime. (44 Cal.Jur.2d, Searches and Seizures, § 23, pp. 305-306.) The fact that the court ordered a portion of the money found on defendant's person at the time of his arrest returned prior to trial does not derogate the fact of its lawful

seizure. The money was surplus to the amount reported stolen from the ice cream company, and the overage was not involved with issues in the present case.

■ Third. *Were defendant's clothes and money properly admitted in evidence?*

*Yes.* The personal effects taken from defendant which were of evidentiary value were properly received in evidence. (*People* v. *Davis*, 205 Cal.App.2d 517, 521 [7] [23 Cal.Rptr. 152].) Where a defendant is charged with robbery, evidence relating to money found on his person when arrested is relevant and admissible, particularly where, as here, the employees testified that they saw defendant take money from the company desk and place it in his pocket.

The fact that the money was not identified as the coins or currency taken in the robbery did not require its exclusion. In *People* v. *Harsch*, 44 Cal.App.2d 572 [112 P.2d 654], the defendant made a similar objection to the admission of money and coins found in his car and on his person at the time of his arrest. The court at page 576 stated: "While it is true that the coins were not capable of identification, and appellant said he obtained them in a crap game, nevertheless, it was definitely established by the testimony of the two men, who were held up, that the money taken from the cash register consisted mainly of small change, consequently, the coins found in appellant's car at the time of the arrest were 'admissible in evidence, not as being sufficient in themselves to warrant or sustain his conviction, but as a circumstance which it was proper to place before the jury for their consideration in passing upon the guilt or innocence of the defendant [citation].' " (See also *People* v. *Hickok*, 198 Cal.App.2d 442, 444-445 [1b] [17 Cal.Rptr. 875].)

Furthermore, it should be noted that defendant made no objection at the trial to the introduction of his personal effects into evidence[1] on the ground of unlawful search and seizure, and he cannot raise the matter for the first time on appeal. (*People* v. *Talbot*, 64 Cal.2d 691, 709 [11] [51 Cal.Rptr. 417, 414 P.2d 633] ; *People* v. *Cockrell*, 63 Cal.2d 659, 667 [9] [47 Cal.Rptr. 788, 408 P.2d 116].)

■ Fourth. *Was defendant prejudiced by his appearance in handcuffs?*

[1]The record shows that before defendant's personal effects (clothes, gloves, tie, wallet, identification, etc.) were admitted in evidence, defendant's counsel and the prosecutor stipulated that certain identification papers disclosing defendant's parole number be excluded. There was no objection to the other items.

*No.* In the presence of the jury, defendant was brought into the courtroom handcuffed, and the restraints were removed prior to the initiation of any judicial proceedings. In chambers defendant moved for a mistrial, which was denied.

 In general, unless there is danger of escape, an accused is entitled to appear during the progress of his trial free of shackles. (*People* v. *Harrington,* 42 Cal. 165 [10 Am. Rep. 296].) However, ''When reasonable precautions are taken to retain custody of an accused the fact that they bring before the jury information that a defendant is a convict and perhaps a dangerous character does not deprive him of a fair trial.'' (*People* v. *Burwell,* 44 Cal.2d 16, 32 [14] [279 P.2d 744].)

 In the present case, defendant was facing a life sentence and had been previously convicted of robbery. It was a reasonable practice for the sheriff to keep prisoners handcuffed while in transit, and the fact that the handcuffs were removed inside the courtroom rather than outside added to the security. (See *People* v. *Hillery,* 65 Cal.2d 795, 805-806 [5] [56 Cal.Rptr. 280, 423 P.2d 208].) There was no harmful effect of such practice, since the jury knew defendant was in custody.

Unlike *People* v. *Harrington, supra,* 42 Cal. 165, and *People* v. *Thompson,* 23 Cal.App.2d 339 [72 P.2d 927], where the defendants were chained and shackled during the progress of their trials, here the handcuffs were removed after the sheriff brought defendant into the courtroom. Moreover, in the *Thompson* case. the error was held not prejudicial because the defendant's guilt was so clear and convincing that no miscarriage of justice resulted.

 Fifth. *Was it prejudicial error to admit a picture of a police lineup in which defendant was clothed in coveralls and the others in street clothes?*

*No.* In *People* v. *Branch,* 127 Cal.App.2d 438, 440 [1] [274 P.2d 31]. identification by means of a standard police lineup was discussed. It was held that a police ''showup'' is not based on any legal requirement but is designed to assist the jury in weighing evidence relative to identification. In the present case, the introduction of the picture may have been advantageous to defendant, rather than prejudicial, since it afforded him an opportunity to impeach the veracity of the lineup identification. The circumstances of the identification was a matter to be considered by the jury in determining the weight it should be given. (*People* v. *Knowles,* 35 Cal.2d 175,

179 [1] [217 P.2d 1]; *People* v. *Shaw,* 237 Cal.App.2d 606, 622 [12] [47 Cal.Rptr. 96].)

Sixth. *Did the prosecutor's comments and the court's instruction on defendant's failure to testify constitute harmless error?*

*Yes.* ▮▮▮ At the time of defendant's trial, the California Constitution permitted comment by the court and counsel on an accused's failure to testify (art. I, § 13). Thereafter, on April 28, 1965, the United States Supreme Court in *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], held that adverse comment violated the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and made applicable to the states through the Fourteenth Amendment. The *Griffin* rule is applicable to cases pending on direct appeal at the time it was announced. (See *Tehan* v. *Shott.* 382 U.S. 406. 409. fn. 3 [15 L.Ed.2d 453, 86 S.Ct. 459]; *People* v. *Perez,* 65 Cal.2d 615, 620 [4], fn. 2 [55 Cal.Rptr. 909, 422 P.2d 597]; *People* v. *Ing,* 65 Cal.2d 603, 609 [1], fn. 2 [55 Cal.Rptr. 902, 422 P.2d 590].)

In *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], the Supreme Court held that constitutional errors do not require automatic reversal of convictions without regard to the facts and circumstances of each case, but that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

We have recently recognized that the *Chapman* rule does not permit us to affirm a conviction "simply because we deem it improbable that a result more favorable to the defendant would have been reached in the absence of the *Griffin* error." (*People* v. *Modesto* (1967) 66 Cal.2d 695, 712 [59 Cal. Rptr. 124, 427 P.2d 788].) The Supreme Court required in *Chapman* that we focus on "reasonable possibility" rather than "probability" (386 U.S. at p 23 [17 L.Ed.2d at p. 710]) and that we cast "on someone other than the person prejudiced by [a federal constitutional error] a burden to show that it was harmless." (*Id.* at p. 24 [17 L.Ed.2d at p. 710].) The court did *not,* however, require that we ignore the possible impact of the error upon the *outcome* of the case.

In this connection. the meaning of the court's reference to errors which " 'might have contributed to the conviction' " (*id.* at p. 23 [17 L.Ed.2d at p. 710]) becomes clear in the

74

context of the entire opinion, since the court expressly stated that it sought "a rule that will save the good in harmless-error practices while avoiding the bad." (*Ibid.*) The court explained the "good" which it wished to preserve by its formulation: Harmless error rules, the court said, "serve a very useful purpose insofar as they block setting aside convictions for small errors or *defects that have little, if any, likelihood of having changed the result of the trial.*" (*Id.* at p. 22 [17 L.Ed.2d at p. 709]; italics added.)

In essence, then, the court avoided any statement of intention to compel the reversal of convictions on the basis of errors which are "harmless' 'in the sense that there is no reasonable possibility of their having affected the outcome of the trial. The prosecution bears the burden of proving beyond a reasonable doubt that a federal constitutional error proved harmless in this sense; once that burden has been discharged, the error "no longer serves as a basis for reversal." (*People v. Modesto, supra,* 66 Cal.2d at p. 712.)

Thus, in applying its rule to the circumstances of the case before it, the court in *Chapman* stressed the fact that "absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." (386 U.S. at pp. 25-26 [17 L.Ed.2d at p. 711].) On the compelling record which we have summarized above, we can conceive of no reasonable possibility that this jury could have reached any verdict other than one of guilt even if the prohibited comments[2] had never been uttered.

---

[2]The trial court gave the standard instruction permitting the jury to draw an inference adverse to defendant from his failure to explain or deny facts within his knowledge.

In his closing argument the deputy district attorney said: ". . . The witness cannot be compelled to testify. He has a constitutional right to remain silent.

"We have the burden of proof and we have to prove the charges involved in this case. Remember, where a defendant fails to testify and there are facts within his own knowledge, facts within his own knowledge which he cannot explain or deny such as the facts in this case, he can very well say, 'I didn't go into this place. You have got the wrong man.'

"In fact that is probably the argument you will hear, but he hasn't even denied or explained any aggregated circumstances.

"So you may take his failure to explain all that as indicating they are true. And the inference that he may draw from our evidence is that the evidence is probably true and as adduced in this case."

With reference to defendant's crashing through a gate when his escape route was blocked, the prosecutor said: "What do you think of a person who would deliberately ram through a fence that way? You can see that he ran right through the fence. Deliberately slowed down and ran right through it. What kind of a person are we dealing with in this case? He

Defendant's attorney in no way suggested here, either through the testimony of witnesses or in argument to the jury, that someone *other* than the defendant might have perpetrated this crime and that the defendant might simply have driven the getaway car from the scene of the robbery or that he might have replaced the robber in the car at some later time. Thus, *as the case was presented to this jury*, only two conclusions were possible: Either the defendant's possession of a vehicle matching the getaway car and containing the proceeds of the robbery was purely fortuitous, or the defendant must have been the robber. Given the fact that the defendant fled from the police and fired at them with a sawed-off shotgun similar to that used in the course of the robbery, the first of these two possibilities evaporated into the inherently incredible, leaving no real gap in the prosecution's case.

Under these circumstances, our remarks in *People* v. *Modesto, supra,* 66 Cal.2d at p. 714, bear repetition here: "In order to prove prejudicial, a comment which could not serve to fill an evidentiary gap in the prosecution's case must at least touch a live nerve in the defense, not one which has been rendered inert by such intrinsic improbability as would prevent it from generating any real doubt in the mind of a reasoning juror. Thus the posture of the defense in the instant case minimized to the point of insignificance the possible impact of the comment." We need not speculate here whether the comment *might* have assumed significance if the defense had planted the suggestion that the defendant had an accomplice who actually committed the robbery and did the shooting; our function under *Chapman* is not to assess the prejudicial impact of an error in a trial which did not occur but to evaluate that impact as the case in fact unfolded at *this* trial. Placing the burden of proof upon the prosecution, we have concluded that the challenged comments proved entirely inconsequential in the case before us. Accordingly, *Chapman* does not require the state to conduct a new trial.

The judgment is affirmed.

Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

hasn't even come up here to deny any of this. We have all those photographs. You can look at them."

Near the end of his argument the prosecutor said: "Folks, I think that I usually talk about an hour, but in this case the evidence is so overwhelming, yet the evidence is so aggravating, so terrifying, and he, as I have been saying, he hasn't wanted even to get up here and say, 'I didn't do it.' He is not guilty, but he could say that much."

TRAYNOR, C. J.—I dissent.

The record establishes that the instruction and comment on defendant's failure to testify were prejudicial under *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

A jury found defendant guilty of the robbery of an ice cream company and the attempted murder of the manager, Walter Williams. The robber, who was masked, carried a sawed-off shotgun and threatened to use it during the course of the robbery. He warned Williams and Brown, the assistant manager, not to follow him out of the plant. Williams did so, however, and was shot in the leg by pellets from a shotgun. Although Williams could not see his assailant, who was hidden behind an automobile a hundred feet away, he believed that the fleeing robber fired the shot.

Brown gave police officers a description of the robber, and bystanders gave them a description of the suspect's automobile. Approximately 40 minutes after the robbery, a police unit saw a car answering the description given by the bystanders. The driver was wearing a distinctive red vest, white shirt, and dark tie. The officers pursued the car, and during the chase the driver fired a shotgun at them. They followed the car until it was driven to a dead end and abandoned. They arrested defendant not far from the abandoned car. He was wearing a red vest and white shirt and had a dark tie in his hand. The officers identified him as the driver of the car. They found a sawed-off shotgun and the proceeds of the robbery in the car, which was registered in defendant's name.

Although defendant was linked to the car and the car was linked to the robbery, the only direct link to the commission of the robbery and the attempted murder was the doubtful identification of defendant by Williams and Brown.

Williams identified defendant as the robber at the trial, but the identification could have been disbelieved or deemed unreliable by the jury. He admitted under cross-examination that he could not remember any distinctive feature of the robber or his clothing. The robber was masked, and Williams did not supply the officers with any usable description of him.

Brown's identification of defendant as the robber could also have been disbelieved or deemed unreliable by the jury. He described the robber as wearing tan pants and having dark hair. Defendant has blond hair and was wearing dark

pants when he was arrested. Brown admittedly had less opportunity than Williams had to see the robber during the course of the robbery. Brown did not mention the distinctive red vest, white shirt, and dark tie, described by the officers and used by them as a basis for identifying defendant as the driver of the car. Moreover, his description of the robber did not aid the officers in their pursuit.

Brown identified defendant in a police showup, but this identification could also have been disbelieved or deemed unreliable by the jury. Defendant was dressed differently from the others at the showup; he wore coveralls, but the other participants wore street clothing. (Cf. *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178], 87 S.Ct. 1951]; *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].)

Defendant's identification by Williams and Brown was subject to doubt on another ground. Defendant was a stranger to the ice cream company's plant, and neither Williams nor Brown had ever seen him before. The robber, however, was familiar with the plant. He called Williams "Walt," a name used only by Williams' associates; he knew that the area where the company safe was kept was called the "safe room"; and he knew the location of the "safe room." This evidence that the robber was an insider or had a co-conspirator who was an insider casts considerable doubt on defendant's being the robber. There may have been two men involved, one who committed the robbery and attempted murder and another who either waited in the car or joined the robber later. If the robber left the car in the possession of another man during the 40-minute period before it was seen by the police unit, that circumstance would explain the inaccurate descriptions of the clothing and hair color of the robber as compared with the person ultimately arrested.

At the outset of his argument the prosecutor stated that the weak point in his case was the lack of clear identification of defendant as the robber.[1] He admitted the difficulty of inferring that because defendant was linked to the car and the car was linked to the robbery, defendant committed the robbery and attempted the murder of Williams. To bolster his case,

[1] "In this case I am not going to discuss the elements. The crime was committed. The fact is undisputed that there was a robbery and there was an attempted murder. There is no question about that at all. The only failure is—we haven't proved that the defendant was responsible."

the prosecutor relied heavily on defendant's failure to take the stand and deny that he was the robber and attempted murderer. He told the jury that defendant's failure to deny or explain the facts in the case allowed them to consider as true the inferences most favorable to the prosecution. Each time the prosecutor's argument faltered he relied heavily on comment on defendant's silence, and the court's instruction expressly sanctioned the drawing of adverse inferences therefrom by the jury.[2]

Although the prosecutor might have proceeded on the theory that defendant was either the actual robber or an accessory who drove the getaway car, he chose to try the case solely on the more difficult theory that defendant personally committed the robbery and the attempted murder. Moreover, he admitted that the state's case left room for doubt as to defendant's guilt. Since defendant presented no evidence, his defense was necessarily based on the weakness of the eyewitness identification and the gaps in the circumstantial evidence linking him to the actual commission of the robbery. His

---

[2] ''Remember, where a defendant fails to testify and there are facts within his own knowledge, facts within his own knowledge which he cannot explain or deny such as the facts in this case, he can very well say, 'I didn't go into this place. You have got the wrong man.' In fact that is probably the argument you will hear, but he hasn't even denied or explained any aggregated circumstances. So you may take his failure to explain all that as indicating they are true. . . .

''What kind of person are we dealing with in this case? He hasn't come up here to deny any of this. . . .

''Folks, I think that I usually talk about an hour, but in this case the evidence is so overwhelming, yet the evidence is so aggravating, so terrifying, and he, as I have been saying, he hasn't wanted even to get up here and say, 'I didn't do it.' He is not guilty, but he could say that much. . . .

''We connect the robbery through the identification of the property of yours. How did I get it? He didn't even take the witness stand. And he explained this was his car. He wasn't driving it. And to explain how this money got in there, and what would you say if you found money like that in my car just soon after the robbery? What would you think I was up to? Going out for a picnic or something like that? This is proof of a robbery, in the position of a robber and murderer very soon after the offense. . . .

''And the comment which Mr. Arias [defendant's counsel] made was beyond the evidence. There is no question that Mr. Ross didn't walk into that place. There is no evidence by him saying that he did not walk into this place. He didn't offer any testimony at all.''

The court instructed the jury concerning the defendant's failure to testify as follows: ''As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom, those unfavorable to the defendant are the more probable.''

counsel pointed out to the jury that defendant was charged with actually committing the robbery and attempted murder, and he urged that the evidence established a reasonable doubt. He thus relied on the fixed procedural requirement of proof beyond a reasonable doubt.

It is for the jury to determine whether the balance of probabilities excludes a reasonable doubt. Unless that balance appears from the evidence so overwhelming that no reasonable juror could entertain a reasonable doubt, argument and instruction "that among the inferences that may be reasonably drawn from [the evidence] those unfavorable to the defendant are the more probable,"[3] necessarily vitiate the defense of reasonable doubt. Under such instruction and argument doubts need not be resolved in favor of the defendant but may be resolved in favor of the prosecution, thereby enhancing the probabilities of a guilty verdict. By diminishing the fixed procedural requirement of proof beyond a reasonable doubt, the error deprived defendant of a substantial right and denied him a fair trial. (*Bollenbach* v. *United States,* 326 U.S. 607, 614 [90 L.Ed. 350, 355, 66 S.Ct. 402]; *Bihn* v. *United States,* 328 U.S. 633, 637 [90 L.Ed. 1484, 1487-1488, 66 S.Ct. 1172]; see also *Boatright* v. *United States,* 105 F.2d 737, 740.) Moreover, since it served to stifle the doubts that might reasonably have been engendered by the inconsistencies in the prosecution's cirumstantial case, it may even have carried decisive weight with the jury. Accordingly, the Attorney General has not established beyond a reasonable doubt that the error did not contribute to the result. (*Chapman* v. *California,* 386 U.S. 18, 24, 26 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824].)

The majority opinion states that "on the compelling record which we have summarized . . . we can conceive of no reasonable possibility that this jury could have reached any verdict other than one of guilt even if the prohibited comments had never been uttered." Even if this factual assumption were correct, it is one that should never be allowed to undermine our commitment to procedural fairness. "Are we then to disregard errors no matter how substantial, if upon a review of the evidence we are satisfied with the verdict of the jury? Such a course will simply mean in the long run the abolishing of all forms of law taught by experience to be necessary to the protection of the innocent." (*People* v. *Marendi,* 213 N.Y.

---

[3]This statement is from the trial judge's charge. See footnote 2, *supra.*

600, 619 [107 N.E. 1058, 1064]; *People* v. *Nuzzo,* 294 N.Y. 227, 235-236 [62 N.E.2d 47, 51].) Verdicts that may be based on constitutional error must not be allowed to stand. (*Robinson* v. *California,* 370 U.S. 660, 665 [8 L.Ed.2d 758, 762, 82 S.Ct. 1417]; *Williams* v. *North Carolina,* 317 U.S. 287, 292 [87 L.Ed. 279, 282, 63 S.Ct. 207, 143 A.L.R 1273]; *Stromberg* v. *California,* 283 U.S. 359, 368 [75 L.Ed. 1117, 1122, 51 S.Ct. 532, 73 A.L.R. 1484].)

In our own cases we have stated that "[t]he fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has not been a miscarriage of justice." (*People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607] [disparaging comments by judge]; see also *People* v. *Conley,* 64 Cal.2d 310, 319-320 [49 Cal.Rptr. 815, 411 P.2d 911] [right to jury trial on every significant issue]; *People* v. *McKay,* 37 Cal.2d 792, 798-800 [236 P.2d 145] [unfair pretrial publicity]; *People* v. *Sarazzawski,* 27 Cal.2d 7, 10-11 [161 P.2d 934] [various errors causing denial of a fair trial]; *People* v. *Patubo,* 9 Cal.2d 537, 542-543 [71 P.2d 270, 113 P.2d 1303] [disparaging comments by judge]; *People* v. *Muza,* 178 Cal. App.2d 901, 913-914 [3 Cal.Rptr. 395], cert.den. 369 U.S. 839 [7 L.Ed.2d 843, 82 S.Ct. 869] [remarks of trial judge]; *People* v. *Duvernay,* 43 Cal.App.2d 823, 828-831, 111 P.2d 659] [misconduct of prosecution].) Similarly in *People* v. *Spencer,* 66 Cal.2d 158, 163 [57 Cal.Rptr. 163, 424 P.2d 715], the court, faced with a nonprejudicial confession under the rule of *People* v. *Cotter,* 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862], refused to rest "affirmance of the judgment solely upon our evaluation of the minor effect of the defendant's confession upon the *jury;* we must still weigh its impact upon defendant's *trial.*" In following *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229], and *Chapman* v. *California, supra,* 386 U.S. 18, we were concerned with procedural fairness, with the integrity of the judicial process, as well as with the outcome of the case. It bears emphasis that we cannot adhere to rules that we would adopt were the final responsibility ours (see *People* v. *Modesto,* 62 Cal.2d 436, 447-454 [42 Cal.Rptr. 417, 398 P.2d 753]; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), but must faithfully adhere to the United States Constitution as interpreted by the United States Supreme Court.

By focusing solely on the outcome of the case, the majority opinion misconceives the purpose of the harmless error rule as it has developed in the federal courts. *Chapman* stands at the

end of a long line of Supreme Court cases determining the standards for harmless error in criminal cases,[4] in which the court benefited from a remarkable dialogue in the Second Circuit[5] whose principal participants were Learned Hand and Jerome Frank. Since the earlier federal standards were less favorable to defendants than the *Fahy-Chapman* standard, except for those errors deemed automatically prejudicial, error that would have been reversible under the earlier cases is *a fortiori* reversible now. Under those cases the majority opinion in the present case errs by independently determining guilt or innocence (*Weiler* v. *United States*. 323 U.S. 606, 611 [89 L.Ed. 495, 499, 65 S.Ct. 548, 156 A.L.R. 496]), impliedly speculating on the possibility of reconviction (*Kotteakos* v. *United States, supra,* 328 U.S. 750, 763 [90 L.Ed. 1557, 1565-1566]), and considering the evidence without the error and thereby minimizing the influence of the error on the verdict (*Bihn* v. *United States, supra,* 328 U.S. 633, 637 [90 L.Ed. 1485, 1488]; *Fahy* v. *Connecticut, supra,* 375 U.S. 85, 88-92 [11 L.Ed.2d 171, 174-176]).

Review of the development of the harmless error rule demonstrates that it cannot be lightly invoked to cure constitutional error. Roscoe Pound. an early advocate of harmless error reform in the United States, attacked the "Exchequer rule"[6] that required reversal for all errors and stated that

---

[4]See, e.g., *Horning* v. *District of Columbia,* 254 U.S. 135 [65 L.Ed. 185, 41 S.Ct. 53]; *Sinclair* v. *United States,* 279 U.S. 749 [73 L.Ed. 938, 49 S.Ct. 471, 63 A.L.R. 1258]; *Aldridge* v. *United States,* 283 U.S. 308, 315 [75 L.Ed. 1054, 1058, 51 S.Ct. 470, 73 A.L.R. 1203]; [dissenting opinion]; *Berger* v. *United States,* 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629]; *Bruno* v. *United States,* 308 U.S. 287 [84 L.Ed. 257, 60 S.Ct. 198]; *United States* v. *Socony-Vacuum Oil Co.,* 310 U.S. 150 [84 L.Ed. 1129, 60 S.Ct. 811]; *Weiler* v. *United States,* 323 U.S. 606 [89 L.Ed. 495, 65 S.Ct. 548, 156 A.L.R. 496]; *Bollenbach* v. *United States,* 326 U.S. 607 [90 L.Ed. 350, 66 S.Ct. 402]; *Bihn* v. *United States, supra,* 328 U.S. 633; *Kotteakos* v. *United States,* 328 U.S. 750 [90 L.Ed. 1557, 66 S.Ct. 1239]; *Fiswick* v. *United States,* 329 U.S. 211 [91 L.Ed. 196, 67 S.Ct. 224]; *Krulewitch* v. *United States,* 336 U.S. 440 [93 L.Ed. 790, 69 S.Ct. 716].

[5]*United States* v. *Berger,* 73 F.2d 278, revd. 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629]; *United States* v. *Bruno,* 105 F.2d 921, revd. 308 U.S. 287 [84 L.Ed. 257, 60 S.Ct. 198]; *United States* v. *Liss,* 137 F.2d 995; *United States* v. *Mitchell,* 137 F.2d 1006; *United States* v. *Bollenbach,* 147 F.2d 199, revd. 326 U.S. 607 [90 L.Ed. 350, 66 S.Ct. 402]; *United States* v. *Lekacos,* 151 F.2d 170, revd. 328 U.S. 750 [90 L.Ed. 1557, 66 S.Ct. 1239]; *United States* v. *Rubenstein,* 151 F.2d 915; *United States* v. *Bennett,* 152 F.2d 342, revd. sub. nom., *Bihn* v. *United States,* 328 U.S. 633 [90 L.Ed. 1485, 66 S.Ct. 1172]; *United States* v. *Antonelli Fireworks Co.,* 155 F.2d 631; *United States* v. *Krulewitch,* 167 F.2d 943, revd. 336 U.S. 440 [93 L.Ed. 790, 69 S.Ct. 716].

[6]*Crease* v. *Barrett,* 1 C.M. & R. 933, 149 Eng. Rep. 1353 (Ex. 1835). See generally 1 Wigmore, Evidence, § 21 (3d ed. 1940). A harmless error

"the worst feature of American procedure is the lavish granting of new trials." (Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice* (1906) 29 A.B.A. Rep. 395, 413; see also (1908) 33 A.B.A.Rep. 542, 545, fn. 1 [bibliography of other contemporary criticism].) In 1907 the American Bar Association established a Special Committee to Suggest Remedies and Formulate Proposed Laws to Prevent Delay and Unnecessary Cost in Litigation. ((1907) 31 A.B.A. Rep. 505.) The Special Committee recommended the enactment of a statute ((1908) 33 A.B.A.Rep. 542, 550) that was introduced in Congress in 1908 and reintroduced in 1909 in a slightly modified form (S. 4568; H.R. 14,552). A supporting brief stated that the purpose of the bill was to stop "reversals for technical defects in the procedure below." ((1910) 35 A.B.A.Rep. 624.) Contemporaneously with the hearings on the A.B.A. "technical error" bill in Congress, Senator A. E. Boynton of the California Legislature proposed an amendment to the California Constitution substantially the same as the A.B.A. bill.[7] The Legislature adopted the proposed amendment, and it was placed on the ballot. The official argument to the voters describes the reasons for the reform movement in the United States and presents examples of technical errors complained of by the reformers.[8] The California consti-

rule had been prevalent before that time "as there could not be a new trial in felony, such a conviction ought not to be set aside [fn. omitted], because some other evidence had been given which ought not to have been received." (*Rex* v. *Ball*, Russ & Ry. (1807) 132, 133, 168 Eng. Rep. 721.) The rule requiring per se reversals became the prevailing rule in this country. (Wigmore, Evidence, *supra*, § 21.)

[7] "No judgment shall be set aside, or new trial granted in any criminal case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless, after an examination of the entire cause including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (2 Cal. Stats. 1911, Res. Ch. 36, p. 1798 (Sen. Const. Amend. No. 26).) The language in the A.B.A. bill and the California constitutional amendment was suggested by Order 29, rule 6, of the Rules of the English Supreme Court of Judicature. (See (1910) 35 A.B.A. Rep. 614, 615.)

[8] Statement of Senator A. E. Boynton: ". . . The absurd lengths to which courts have gone in the reversal of cases for immaterial errors is shown by a recital of a few examples: In Missouri a case was reversed and the prisoner escaped conviction because the indictment alleged the deceased 'instantly died' instead of charging according to the ancient formula that he 'did then and there die.' In a Texas case the elimination of the letter 'r' from the word 'first' saved a murderer from the gallows, when his guilt was absolutely determined. In our own state a conviction for murder was set aside because the indictment failed to state that the man killed was a human being. . . .

The Missouri case was a commonly used example during the reform

tutional amendment was adopted on October 10, 1911, and the federal harmless error rule was adopted by Congress in 1919.[9] Based on this history the Supreme Court stated that the federal harmless error statute was intended "to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." (*Bruno* v. *United States, supra,* 308 U.S. 287, 293-294 [84 L.Ed. 257, 260-261].) "The 'technical errors' against which Congress protected jury verdicts are of the kind which led some judges to trivialize law by giving all legal prescriptions equal potency. See Taft, *Administration of Criminal Law* (1905) 15 Yale L.J. 1, 15. Deviations from formal correctness do not touch the substance of the standards by which guilt is determined in our courts, and it is these that Congress rendered harmless. . . ." (*Bollenbach* v. *United States,* 326 U.S. 607, 615 [90 L.Ed. 350, 355, 66 S.Ct. 402].)

The Supreme Court has construed the federal rule to place the burden on the prosecution to show that "substantial rights" were not affected by the error. (*Kotteakos* v. *United States, supra,* 328 U.S. 750, 760 [90 L.Ed. 1557, 1564].) In California, on the other hand, the court has consistently placed the burden on the appellant attacking the verdict. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836-838.) Since the

period and is cited and discussed in *Kotteakos* v. *United States, supra,* 328 U.S. 750, 760, fn. 14 [90 L.Ed. 1557, 1564].

Statement of State Senator E. S. Birdsall:". . . The supreme court has held in 21 Cal. 344 that it is a fatal omission to fail to state in an indictment for robbery that the property taken is not the property of the person charged, although the very word 'robbery' itself conclusively implies this. In 56 Cal. 406 a conviction was set aside because the letter 'n' was accidentally omitted from the word 'larceny,' though it is probable that no person in the wide world could have had any doubt as to the word intended. . . . In 62 Cal. 309 a conviction of murder was reversed because the trial court permitted a surgeon who had examined the wounds to testify as to the probable position of the deceased when the fatal shot was fired. This was in line with the doctrine announced in 47 Cal. 114 that 'every error in the admission of testimony is presumed to be injurious unless the contrary clearly appears.' Trial judges of long experience declare that it is wholly beyond human skill for the most able and conscientious judge, in the course of a long and busy trial extending over days or weeks to avoid trifling inaccuracies now and then in the thousand and one rulings that they are compelled to make on the spur of the moment. . . ."

[9]28 United States Code section 2111 now provides: "On the hearing of an appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." Federal Rules of Criminal Procedure, rule 52, subdivision (a), provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

original focus of harmless error reform was on technical error, it has always been recognized that some errors were reversible regardless of the guilt or innocence of the defendant. (See *Gideon* v. *Wainwright*, 372 U.S. 335, 344 [9 L.Ed.2d 799, 805, 83 S.Ct. 792, 93 A.L.R.2d 733] ; *Tumey* v. *Ohio*, 273 U.S. 510, 523 [71 L.Ed. 749, 754, 47 S.Ct. 437, 50 A.L.R. 1243] ; *People* v. *Conley, supra,* 64 Cal.2d 310, 319-320; *People* v. *McKay, supra,* 37 Cal.2d 792, 798-800; *People* v. *Sarazzawski, supra,* 27 Cal.2d 7, 10-11; *People* v. *Patubo, supra,* 9 Cal.2d 537, 542-543; *People* v. *Mahoney, supra,* 201 Cal. 618, 627; *People* v. *Muza, supra,* 178 Cal.App.2d 901, 913-914, cert.den. 369 U.S. 839; *People* v. *Duvernay, supra,* 43 Cal.App.2d 823, 828-831.) The *Chapman* case establishes, however, that *Griffin* error is not necessarily prejudicial.

To affirm the judgment under the rule set forth in the *Chapman* case the court must ''be able to declare a belief that [the error] was harmless beyond a reasonable doubt.'' (386 U.S. at p. 24 [17 L.Ed.2d at p. 711].) We must be able to say that the Attorney General ''has demonstrated, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instruction did not contribute to'' defendant's conviction. (386 U.S. at p. 26 [17 L.Ed.2d at p. 711].) This language is susceptible of two interpretations, and the *Chapman* opinion lends support to both.

It may mean only that the court must believe beyond a reasonable doubt that the result would have been the same in the absence of the error. Under this view, if the court concludes beyond a reasonable doubt that no reasonable jury could have found the defendant innocent on the same record minus the error, it should affirm. This approach is the one this court has adopted in interpreting the California harmless error rule (Cal. Const., art. VI, § 13), although our standard for affirmance is not proof beyond a reasonable doubt that the result would have been the same, but the absence of a showing that it is reasonably probable that the result would have been different in the absence of the error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) *Watson* makes clear, of course, that ''reasonably probable'' does not mean more probable than not. It means only that there appear some substantial chance greater than a mere possibility that the result would have been different in the absence of the error. Thus the court was careful to point out that a reversal is required if it cannot be determined whether or not the error affected the result, for in such case there ''exists . . . at least such an

equal balance of reasonable probabilities'' that ''the court is of the opinion 'that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' '' (46 Cal.2d at p. 837.)

There is language in *Chapman* that indicates that the court was concerned with the possibility that the result would have been different in the absence of the error. It seems more likely, however, that the court deemed a showing beyond a reasonable doubt that the result would not have been different as only the first step in establishing that a constitutional error was not prejudicial. Thus it contrasted ''small errors or defects that have little, if any, likelihood of having changed the result of the trial'' with errors that '' 'affect substantial rights' '' of a party, and it pointed out that ''An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy,* be conceived of as harmless.'' (*Chapman* v. *California,* 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 827-828].) Moreover, it expressly rejected this court's reliance on overwhelming evidence to establish harmless error, a rejection that can be explained only on the theory that a substantial error that might have contributed to the result cannot be deemed harmless regardless of how clearly it appears that the jury would have reached the same result by an error-free route had the erroneous route been denied it. Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached, for the jury may have reached its verdict because of the error without considering other reasons untainted by error that would have supported the same result. (*Robinson* v. *California, supra,* 370 U.S. 660, 665 [8 L.Ed.2d 758, 762]; *Williams* v. *North Carolina, supra,* 317 U.S. 287, 292 [87 L.Ed. 279, 282]; *Stromberg* v. *California, supra,* 283 U.S. 359, 368 [75 L.Ed. 1117, 1122].)

The view that *Chapman* requires the state to show not only that the result would have been the same absent the error, but also that the error could not have played any substantial part in the jury's reaching its verdict, finds support in earlier Supreme Court decisions. In determining whether an error is substantial, i.e., whether it affected a substantial right of the defendant, the court has focused on the part the error may have played at the trial. Once it appears that it was a sub-

stantial part of the prosecution's case, reversal is required. Neither the court's own view of the defendant's guilt nor its conviction that the jury would have reached the same result in the absence of the error can then save the judgment. (*Bihn* v. *United States, supra,* 328 U.S. 633, 637 [90 L.Ed. 1484, 1488]; *Kotteakos* v. *United States, supra,* 328 U.S. 750, 763 [90 L.Ed. 1557, 1565-1566]; *Bollenbach* v. *United States,* 326 U.S. 607, 613-614 [90 L.Ed. 350, 354-355, 66 S.Ct. 402]; *Weiler* v. *United States, supra,* 323 U.S. 606, 611 [89 L.Ed. 495, 499]; *Bruno* v. *United States,* 308 U.S. 287, 294 [84 L.Ed. 257, 260-261, 60 S.Ct. 198].)

In the present case, as in *Chapman,* the comments and instruction on defendant's silence constituted a substantial part of the prosecution's case. It served to make defendant a witness against himself by using his silence to stifle the doubts that might have been engendered by the inconsistencies in the prosecution's case. (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) It denied defendant a substantial right, for it served to deprive him of his only defense. Under these circumstances the Attorney General has not established beyond a reasonable doubt that the verdict would have been the same in the absence of error. *A fortiori,* he has not established beyond a reasonable doubt that the erroneous comment and instruction did not in fact contribute to the result.

Peters, J., concurred.